## BOWIE, ET AL. *v.* BOARD OF COUNTY COMMISSIONERS OF HOWARD COUNTY, ET AL.

[No. 21 (Adv.), September Term, 1969.]

*Decided May 27, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, McWILLIAMS, SINGLEY and SMITH, JJ.

*Harry Goldman, Jr.* and *Earl L. Carey, Jr.* for the appellants.

*John Martin Jones, Jr.,* with whom were *George A. Nilson* and *Thomas E. Lloyd* on the brief, for the appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Appellants, aROUSEd[1] by the impending invasion of their heath by General Electric Company (GE), have adopted, as a means of resistance, a kind of scorched earth policy with Fabian overtones. Aware of GE's unwillingness to exercise its option to buy the 1,087 acre tract (the property) upon which it proposes to build a $250,000,000 plant unless and until the zoning is changed to ID (Industrial Development District), appellants fought the application for reclassification both before the County Commissioners and in the Circuit Court for Howard County. They lost both of those battles; here they lose the war.

A proper understanding of this appeal requires a brief reference to the short history of the "New Town of Columbia."

---

1. Comment, *Democracy in the New Towns: The Limits of Private Government,* 36 U. Chi. L. Rev. 379, 385 (1969).

In August 1965 The Howard Research and Development Corporation, a Maryland corporation (HRD), had accomplished the acquisition of about 14,000 acres of land, in Howard County. On 10 August 1965 the Board of County Commissioners (the Commissioners) designated the entire tract as a "New Town District" pursuant to existing zoning regulations. Under the direction of The Rouse Company which owns 50% of the stock of HRD (the other 50% is owned by a life insurance company) the new town began to evolve. Early in 1968 HRD learned that GE had in mind building a major plant somewhere in the northeast. GE took a very hard look at proposals made by HRD and in June 1968 it took an option to purchase the property at a price $1,700,000 less than HRD had paid for it. GE, driving a hard bargain, insisted that the property be rezoned and ready for construction by early 1969.

The property, which abuts the southern boundary of Columbia, is approximately square, about one and one-half miles on each side. Interstate Route 95, now under construction, is its eastern boundary; the north side is bounded by new Maryland Route 175, parts of which are under construction; the western boundary is New Berger Road, planned and engineered as a four-lane dual highway and to be constructed by HRD at its expense; the southern boundary will be a spur of the C&O-B&O Railroad which is being extended from Annapolis Junction, through which the railroad's main line passes.

The northernmost 377 acre portion of the property is part of the 14,000 acres that were classified "New Town District" in 1965. On the Preliminary Plan approved in connection with the 1965 rezoning it was designated as an "employment uses" area in which the regulations permit local and general business, motels, shopping centers, and light and restricted manufacturing. HRD recently acquired the remaining 710 acres for the specific purpose of meeting GE's requirements. All but 100 of the 710 acres had been owned by two sand and gravel companies and there is uncontradicted evidence that their mining operations (a non-conforming use) had been both active and extensive. All but 57 acres (zoned M-1 [Heavy Industrial]) of the sand and gravel companies' property had been zoned R-20 (Residential-Half acre lots) in the comprehensive zoning

of 1961. The 100 acres acquired from others are also in the R-20 classification.

HRD and GE seem to have agreed that the county's ex- isting zoning classifications were not compatible with GE's proposed use of the property. GE contemplates "the develop- ment of a production and distribution facility designed to sup- ply the full range of major home appliances to the eastern sea- board of the country." The plant is to consist of buildings aggregating 4,500,000 square feet of floor space, costing not less than $250,000,000. An annual payroll of $100,000,000 is ex- pected to be distributed to a minimum of 12,000 employees. Having concluded that the creation of a new zoning classifica- tion would be necessary to accommodate GE's "modern complex of industrial facilities" HRD, on 18 September 1968, filed a pe- tition to amend the zoning regulations by adding thereto new Section 14A creating the concept of the Industrial Develop- ment (ID) Zoning District and providing the procedure for establishing such districts. At the same time HRD filed another petition seeking the deletion of the 377 acre portion from the New Town District so that it could be made a part of the 1,087 acres under option to GE. HRD also represented to the Commissioners that reclassification of the 1,087 acres to ID would be sought, if and when the Commissioners enacted Sec- tion 14A.

Pursuant to a proper notice by publication the Commission- ers held the scheduled hearing, in respect of proposed Section 14A, on 11 October 1968. Experts and employees of HRD and GE testified at length in support of the adoption of the new section. A number of residents testified that they favored its adoption. Mrs. Ella Mae Bowie was the only one of the appel- lants who testified at that hearing. She said she had "had an opportunity to read and digest" Section 14A; she said she was in favor of "orderly industrial development" in Howard County; but she couldn't say whether she was for Section 14A or against it. The report of the Howard County Planning Commis- sion recommended approval with some changes. On 15 October 1968 the Commissioners adopted Section 14A, after having included the changes recommended by the Planning Commis- sion, plus a few of their own.

On 11 October 1968, the Commissioners also heard (immediately following the Section 14A hearing) testimony in respect of HRD's petition to delete the 377 acre portion from the New Town District. Counsel for the protestants (appellants included) said he thought it was "necessary to agree to the deletion. We have no opposition to that," he said, adding that the protestants were "not going to raise any opposition." There followed then a lengthy colloquy between counsel and the Commissioners, after which, on motion of the protestants, the hearing was continued to 15 October at 1:30 p.m. Other than to introduce (by stipulation) the testimony offered in the hearing on Section 14A, the protestants presented nothing further when the hearing was resumed on 15 October.

On 16 October 1968, the day after the Commissioners enacted Section 14A, HRD filed its petition for the reclassification of the property to an ID district. Included, of course, were the 377 acres deleted from the New Town District. The hearing, of which proper notices had been given, was held on 1 November 1968. First off the protestants, now represented by new counsel, pressed for a postponement. It was denied, as was another request made at the close of petitioners' case. Employees of both HRD and GE testified at length in support of the reclassification to ID. There was also an abundance of testimony from experts in the field of real estate, planning and zoning to the same effect. A number of citizens voiced support. The report of the Planning Commission recommending the reclassification and giving its reasons therefor was filed. The Howard County Metropolitan Commission offered no objection. Neither did the State Roads Commission. From the testimony, surveys, maps, plats, reports and studies before the Commissioners one could conclude without difficulty that in 1961, when the comprehensive zoning map was adopted, Howard County was distinctly rural in character. Nearly all of the property was classified R-20. Adjacent areas were classified either R-20 or R-40 (Residential —1 acre lots). A narrow, secondary road provided the only access to the property. No rail service was available. Other than farming, the sand and gravel operations constituted the only business activity in the area. One could also arrive at the following conclusions. The rezoning in 1965 of the adjoining

14,000 acres (including the 377 acres of the property) to a New Town District resulted in the birth of Columbia and the beginning of its sturdy adolescence; its present population is said to be about 4,000. The increase in sand and gravel operations brought about the reclassification of 57 acres of the property to M-1. Interstate 95, in 1961 nothing but a dotted line on the maps, was, in 1968, under construction along the eastern boundary of the property. The interchange of the new four-lane Route 175 and Interstate 95 in the northeast corner of the property was being built in 1968 but it was unheard of in 1961. New Berger Road (North South Parkway) along the western boundary of the property had not been contemplated in 1961. No one gave rail service a thought in 1961 because there was no need for it, but a representative of the railroad's Industrial Development Department testified (in November 1968) that 37 men had been busy for nearly a year furthering the planned extension of trackage to Columbia by way of the property.

Of the appellants only Mrs. Bowie and the McMullens testified. In Mrs. Bowie's opinion, as she expressed it, while "industry is very important * * * the value of * * * [her] property was going to drop" and the relocation of roads would cause some inconvenience. Mr. McMullen expressed some uneasiness about the effect of GE's activities on the value of his property. He thought "property values would definitely go down." Mrs. McMullen expressed similar misgivings. Mr. McMullen returned to the witness chair later on and told of his investigation of GE's plant at Louisville, Kentucky. His comment is of interest:

> "* * * I would like to say that all the information that I obtained [from Louisville] was most favorable. The people down there were only unhappy with General Electric because they weren't looking for more acreage down there and that they looked upon them as being first rate corporate citizens. That's all I have to say."

Mrs. Carroll E. Lonas (not an appellant), felt that the value of her property would be diminished. No expert testimony was produced on behalf of the appellants or other protestants.

nor was any effort made to support the anticipated decline in the value of their properties. Indeed, there was considerable expert testimony to the contrary.

On 4 November 1968 the Commissioners approved the deletion of the 377 acres from the New Town District and the reclassification of the property to ID. Their findings were as follows:

"(a) That the Petitioner's preliminary plan introduced in evidence meets the requirements of Section 14-A of the Zoning Regulations.

"(b) That if the petition is granted, the subject property will be used as an industrial development under the ownership of The General Electric Corporation.

"(c) That the intent to develop the tract as an industrial development is bona fide and that the parties involved have the resources to develop it in accordance with the preliminary plan introduced in evidence.

"(d) That the Petitioner and the parties involved in the proposed development of the subject property have the requisite intent and capability to fulfill their additional contractual requirements, if this rezoning is granted.

"(e) That the granting of this rezoning is in the public interest and will promote the public health, safety, morals and general welfare.

"(f) That the granting of this rezoning and the industrial development of the subject tract is not inconsistent with and is compatible and harmonious with the comprehensive plan of development of Howard County, as evidenced by the report of the Planning Commission.

"(g) That the granting of the rezoning and the development in accordance with the preliminary development plan submitted will not adversely affect the surrounding properties.

"(h) That the subject property is suitable for the development of a large industrial complex."

On 3 December 1968 the appellants filed their bill of complaint in the Circuit Court for Howard County. After reciting the facts they alleged that the "act of the * * * Commissioners * * * was illegal, unconstitutional, arbitrary, capricious, discriminatory, invalid and void * * * [stating as] reasons:

"(a) That there was no substantial or sufficient evidence to support *the finding of said Board that said reclassification was warranted due to a change in the character of the neighborhood.* [Emphasis added.]

"(b) That the zoning reclassification is not in accordance with the General Plan of Howard County as adopted July 20, 1960.

"(c) That there was not sufficient time allowed to acquire expert testimony to refute the recommendation of the Planning Commission of Howard County.

"(d) That said reclassification is strictly for the private interests of private individuals and will be a detriment to the residential areas in said neighborhood.

"(e) That said reclassification will result in a congested and harmful traffic pattern within the area.

"(f) That said reclassification will adversely affect the said properties of your Complainants and greatly depreciate the value thereof."

The case came on for trial before the chancellor, Macgill, C. J., on 27 January 1969. The appellants repeated substantially the same testimony given before the Commissioners. No expert testimony was offered although on 2 January 1969 Judge Macgill, over the objection of HRD, had indicated that "he would hear additional testimony in open court should the Complainants desire to produce such." HRD offered additional testimony but it was concerned chiefly with appellants' alleged lack of standing.

Judge Macgill filed his opinion on 31 January (four days later); he commented on his expedition in this regard:

"When the matter came on for hearing before the writer in open court, on January 27th, 1969, a cer-

tain amount of additional testimony was put on by the Complainants and transcripts of the testimony taken in several hearings before the Board of County Commissioners were offered in evidence along with a quantity of exhibits which had been filed with and considered by the Board in arriving at its decisions. This Court has been asked to give its decision on or before January 31st and it has agreed to do so, but it is regrettable that the consideration of a matter so complicated and of such importance should be limited to such a short period of time."

Judge Macgill concluded that the "circumstances are sufficient to show that Mr. and Mrs. McMullen, at least, have standing to maintain the action." In this Court HRD put it to us quite strongly that Judge Macgill erred in this regard and that the appeal should be dismissed. We shall not undertake analysis of the evidence relied upon by HRD to support its contention. It suffices to say we are not persuaded that Judge Macgill's finding was clearly erroneous.

HRD insisted below, as it did here, that the ID district is in reality a "floating zone." We think Judge Macgill was correct in rejecting this concept of the ID district. He said:

"The Board, in making its findings, apparently was treating the I-D district as a floating zone and therefore deemed it unnecessary to make findings as to whether there had been a change in conditions since the adoption on May 11th, 1961, of the comprehensive zoning map or a mistake in zoning as to the property in question. The requirements of showing mistake or change are not applicable when a floating zone is involved. *Huff v. Board of Zoning Appeals*, supra [214 Md. 48 (1957)], *Costello v. Sieling*, 223 Md. 24, *Beall v. Montgomery County Council*, 240 Md. 77, and *Board of County Commissioners v. Tipton*, 244 Md. 77. If the I-D district be a floating zone, and it has many of the characteristics of one, then, on the evidence summarized, this Court would have no hesitation in finding that the action of the Board was, at

least, 'fairly debatable' and consequently must be allowed to stand.

"The I-D district is different in one important aspect from the floating zones described and discussed in the cases cited. It permits *all* manufacturing and industrial uses while the other floating zones *specify the uses permitted* and exclude all others. If the I-D district is valid as a floating zone, then it can only mean that industrial uses, indefinite as to number and unascertainable as to character, may be permitted to descend or be anchored in any use area dependent upon the factual findings in any particular case, a privilege which is presently denied to even the lightest of commercial uses. The Board, in approving the creation of the I-D district, did not specifically express an intention that it was planned to be compatible with residential uses or was to be 'superimposed upon property previously classified as residential on substantially the same basis that a particular use might be allowed in a residentially zoned area as a special exception.' *Overton v. Board of County Commissioners*, 223 Md. 141, 150. A comparison of the restrictions imposed on the I-D district with those imposed on the various other non-residential districts in the zoning regulations of the County shows that the I-D restrictions are not materially more detailed or more stringent, particularly in view of the open-ended uses permitted. It is true that a greater setback is required but this is balanced by the fact that the unspecified uses of the I-D district may, potentially, have a greater impact on the surrounding area than those uses permitted in all except M-2 districts.

"'There is, in fact, no explicit mandate in the language providing for the district that *a site plan be approved* * * *. More importantly, there is no provision for a revocation of the classification if the restrictions imposed are not complied with.''

\* \* \*

"It is true that the I-D district has one of the fea-

tures, of a floating zone. It was not in the original zoning ordinance and was not designated on the comprehensive zoning map. This fact, alone, however, would not make it a floating zone. *Overton v. Board of County Commissioners*, supra."

*Compare Haldemann v. Board*, 253 Md. 298 (1969), holding M-R (Manufacturing-Restricted) to be a floating zone.

The chancellor went on to agree with the complainants (appellants) that the reclassification of the property to ID did not create a floating zone and "that mistake or change is the proper test to be applied." But, he said, he found

"* * * sufficient evidence of both to support the granting of the application and to rebut the contention that the action of the * * * [Commissioners] amounted to spot zoning.

"The evidence before the Board, and before this Court, shows that since the adoption of the comprehensive zoning map in 1961, a substantial amount of acreage in the subject property was reclassified, on November 13th, 1962, from R-20 to M-1 northwest of Interstate 95 and that with the advent of Columbia, another substantial amount of acreage was preliminarily designated under the N-T zoning for 'employment center' uses, which, as it has been observed, comprehend both commercial and industrial uses. There was testimony that a railroad spur was planned along the southwesterly portion of the property and highways along the north and northeast boundaries. The southerly line of the property is bounded by I-95. There is a reasonable prospect, therefore, that the land in question will be substantially buffered from surrounding properties, whether they be residential or otherwise. Cf. *Beall v. Montgomery County*, supra, at page 97. It is true, as has been remarked, that only I-95 is presently under construction but there was evidence before the Board sufficient to show that the railroad and the other roads were 'reasonably probable of fruition in the foreseeable future,' and the Board

could take these prospects into consideration in deciding the question of reclassification. *Rohde v. County Board of Appeals*, 234 Md. 259, 264, *Jobar Corporation v. Rodgers Forge,* 236 Md. 106, 112. These evidences of change and of reasonably imminent change were sufficient, in the opinion of this Court, to make the action of the Board 'fairly debatable.' *Wakefield v. Kraft*, 202 Md. 136, *Hyson v. Montgomery County*, 242 Md. 55, *Kirkman v. Montgomery County Council*, 251 Md. 273.

"As to the question of mistake, the Board had before it the testimony of Mr. Bockover as to the unsuitability of that portion of the property zoned R-20 for residential uses. An aerial photograph, offered in evidence, bears out his testimony. Substantial areas of the land appear to have been denuded and exploited for the purposes of quarrying sand and gravel. For a somewhat comparable situation, see *Ark Readi-Mix v. Smith*, 251 Md. 1, where the Court of Appeals sustained the action of the zoning authorities in reclassifying property occupied by a sand and gravel plant as a non-conforming use, from a residential classification to a manufacturing classification."

Appellants contend that "since mistake-change was not even considered, let alone 'debated,' 'fairly' or otherwise by the zoning board, it was an unconstitutional usurpation of legislative power for the lower Court to substitute its judgment for the zoning board's and attempt to apply judicial expertise to an area of expertise reserved by constitutional law for the County Commissioners." The same contention was made before Judge Macgill who disposed of it in the paragraph of his opinion which follows:

"As it has been observed, the Board, in arriving at its conclusion, made no findings on the evidence before it as to change or mistake but acted on the theory of law that the I-D district was a floating zone. It is stated as a principle of law, however, that: 'The reviewing court has the right to consider grounds

justifying the decision below, although the decision was not rested on such grounds and regardless of the fact that the theory advanced below is erroneous.' 2 Am. Jur. 2d 'Administrative Law,' Section 756, citing *Moore v. Clarke*, 171 Md. 39, and *Union Light, Heat and Power Co. v. Public Service Commission,* (Ky.) 271 S.W.2d 361.''

The authorities cited by Judge Macgill could be supplemented by our decisions in *Kirkman v. Montgomery County Council*, 251 Md. 273 (1968), *Clark v. Wolman,* 243 Md. 597 (1966), and *Serio v. Mayor & City Council*, 208 Md. 545 (1956), in which will be found solid support for the principle of law stated by him. In *Hoffman v. Mayor & City Council*, 187 Md. 593, 602 (1947), it was said:

"In *Heaps v. Cobb*, 185 Md. 374, 45 A. 2d 73, there was no evidence in the case to support the finding of the Board of Trustees, but in this case there is evidence to support the finding of the Board of Zoning Appeals. It is true that the reason set out in the resolution of the Zoning Board for refusing to grant this permit is not based on the reason pointed out in this opinion. Without deciding the question of whether the reason given by the Board is correct or not, it is none the less true that if its conclusion was correct it will not be set aside, even if the reason given therefor is wrong."

It is true, as appellants point out, that HRD's main effort before the Commissioners was directed to its claim that the ID district was in fact a floating zone. But, it seems, HRD did not intend to rely entirely on that theory because in its petition, after asserting that "the newly created 'floating' zone district" did not require proof of mistake-change, it went on to state that "as will be shown at the hearing there has in fact been a substantial change in the character of the neighborhood." Appellants must have been under the impression when their bill of complaint was filed that the Commissioners had made a finding of "change in the character of the neigh-

borhood," because they complained that there was "no substantial or sufficient evidence to support" such a finding. They pointed out, also, that the "mistake" testimony came in "by sheer accident" but even if that is so its probative force is not thereby diminished. Incidentallly, it might be noted, the Commissioners did not use the expression "floating zone" in their opinion.

Appellants argue at some length that the evidence is not sufficient to "justify the rezoning." We are not persuaded that this is so. We think there was quite enough evidence, virtually all of it undisputed, before the Commissioners to make the issues of change and mistake fairly debatable, even though they may not have been debated, fairly or otherwise, and we see no need to expand this opinion by discussing it further.

Early on we referred to the fact that GE had laid it down quite firmly that unless the property could be rezoned and ready for construction by early 1969 it would not go forward with the project. Expedition, if not haste, became necessary because of two impending events. The first was the submission to the voters in the election scheduled for 5 November 1968 of the proposed new charter for Howard County. If adopted by the voters the Commissioners, as provided in Section 1103(a) of the charter, would "continue to hold office and exercise and perform their present powers and duties" until 28 January 1969, the effective date of the new government, at which time they would become automatically three members of the new five member County Council. The second impending event was the zoning moratorium established by Chapter 181 of the Laws of Maryland of 1967. It was there provided, that "if * * * [the] charter * * * shall be ratified," final action on any zoning shall be prohibited until the new government shall have assumed office. Appellants have striven to denigrate the action of the Commissioners with such expressions as "the last gasp" of a "lame duck board * * * one day short of its lawful demise." While we deny no one the freedom of epithet we think the appellants, in this context, are somewhat out of line. Far from being "lame ducks" the Commissioners were to become the majority of the new County Council upon the adoption of the charter. It was the possibility

of the moratorium which made imperative the passage of the order of reclassification before 5 November. HRD surely was justified in being fearful that postponement until February 1969 might be fatal to the whole project. Without doubt the vigor and dash displayed by the Commissioners blunted the appellants' prime weapon but it does not follow that, in the process, any of their rights were violated.

The reclassification is invalid, say appellants, because it is special legislation for a private corporation and not for the general welfare. "It is clear from the record [they continue] that from start to finish * * * [the Commissioners] acted as the handmaiden of Rouse [HRD] and G.E. [GE] rather than as guardian of the public interest." It would have to be conceded that at some future time GE and perhaps HRD may become the beneficiaries of this reclassification but appellants have not come near showing that the public interest and welfare may not also be served. Indeed, there are pages of testimony concerning benefits expected to inure to Howard County and its citizens. In *Pressman v. Mayor & City Council*, 222 Md. 330, 339 (1960), Chief Judge Brune, for the Court, said:

> "We also find the appellants' contention that the rezoning is invalid spot zoning because it is solely for the benefit of the proponents and hence is not in accordance with a comprehensive zoning plan or the general welfare, is not sustainable. Doubtless the proponents deemed it to their advantage to seek and obtain the rezoning, and it may very well be. Certainly, they would be unlikely to venture the large amounts of money required for the establishment of shopping centers unless they so believed."

Traffic congestion is "certain to be caused if this rezoning is granted" argue appellants. It must be supposed, of course, that the volume of vehicular traffic will substantially be increased by GE's activities. But it must also be supposed that the proposed new roads (Interstate 95, new Route 175 and the New Berger Road) will be able to handle the increased volume well enough to avoid congestion. In any case there is uncontroverted testimony to that effect. In this regard, what we said

in *Marcus v. Montgomery County Council*, 235 Md. 535, 541 (1964), seems to be apposite:

> "Appellants draw attention to the claim that commercial and apartment zoning is likely to bring more people to a given area and that as a consequence the traffic and school population will increase, and that those members of the neighborhood using the local school and shopping area will suffer from the consequent traffic congestion and over-populated school facilities. These are inconveniences likely to be suffered by any member of the public, far or near, and do not require a denial of the application."

We have dealt with what we think are the most significant of the barrage of contentions made by the appellants. As to the remaining ones, we shall not undertake a discussion of them either because they present nothing new or substantial, or because they were not raised in the court below. Maryland Rule 885. Perhaps we should note that we are not unmindful of appellants' attack, in this Court, on the validity of the ordinance (Section 14A) establishing the ID zoning district. Since that question was not raised below we shall consider Section 14A as a valid enactment of law. *Board v. Levitt & Sons*, 235 Md. 151, 153 (1964).

*Decree affirmed.*
*Costs to be paid by appellants.*