## ROCKVILLE FUEL AND FEED COMPANY, INC. *v.* BOARD OF APPEALS OF THE CITY OF GAITHERSBURG

[No. 227, September Term, 1969.]

*Decided March 4, 1970.*

184

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*James R. Miller, Jr.,* for appellant.

*Joe M. Kyle* for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

At issue here is whether the Board of Appeals of the City of Gaithersburg properly and legally denied the ap-

plication of Rockville Fuel and Feed Company, Inc. for a special exception to construct and operate a ready-mix concrete plant in a heavy industrial zone in Gaithersburg. The Board read the Gaithersburg zoning ordinance to require it, before a special exception could be granted, first to find from the evidence that the proposed facility would "promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity or general welfare." It could not make this finding since to it, the record before it was devoid of "any evidence of an affirmative benefit to the community" and lacked a showing of any kind that the granting of the application "will serve to promote the public welfare."

The Board thought that its next task was, in the words of the ordinance, "to determine that such a use will not unduly disturb or harmfully influence other uses in the area adjoining," and said:

> "Since the Board is unable to make the first finding under Article II, it does not reach the questions which arise under the second. Obviously, the Board must determine whether the advantages which might occur to the total community from the proposed facility outweigh the possible disturbances or harmful influences on the surrounding area. But if there is no evidence of benefit then the extent of harm or disturbance becomes immaterial, unless it is shown there would be no harm or disturbance at all."

The Board went on to note that the weight of the evidence was that substantial harm to the adjoining area would result from "traffic congestion created by the trucks using the proposed plant," that air pollution from cement dust emitted by the proposed plant "might or could result," and that there would be an increase in volume if not in intensity of noise (findings we shall later see are unsupported by any probative evidence whatsoever). The Board finally said:

> "The Board cannot escape the conclusion that

these detriments to the established commercial enterprises in the immediate area would outweigh any possible showing of promotion of the general public welfare."

We think the Board misconceived the meaning of the statute and that its denial of the application was arbitrary. The parties agree that the authority of the City of ·Gaithersburg to zone stems from Code (1967 Repl. Vol.), Art. 66 B. Section 21 thereof gives the power to municipalities to zone "for' the purpose of promoting health, safety, morals or the general welfare of the community." Indeed, this is a reiteration of the ultimate and general purposes of all zoning. As 8 McQuillen, *Municipal Corporations* (1965 Rev. Vol.), § 25.17, p. 53, well puts it:

"More specifically, the common purposes of zoning, sometimes specified by statute and in any event implicit in the concept of comprehensive zoning and reasonably related to the public safety, health, morality and convenience, include the following: Avoidance of undue concentration of population; prevention of overcrowding of land or buildings; establishment of residential districts to promote the public welfare, protect property values, advance the attractiveness of the city, and perhaps improve its esthetic features; establishment of trade and industrial districts in the interest of public health and safety and for economic reasons as well; securing of safety from fire, panic and other dangers; promotion of public sanitation; exclusion of dangerous, offensive and unwholesome trades and industries from certain districts; protection of adequate light and air; lessening of congestion in the streets; and reduction of hazards to traffic generally and to school children especially."

*See also* 101 C.J.S. *Zoning* § 2.

Section 21 (b) of Art. 66B of the Code authorizes use districts and § 21 (c) expresses the purposes in so doing as follows:

> "Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements."

This Court has recognized all these fundamental principles as bases for decision. *Mayor & City Council of Baltimore v. Byrd,* 191 Md. 632, 637; *Carney v. City of Baltimore,* 201 Md. 130, 134-135; *American Oil Co. v. Miller,* 204 Md. 32, 43-44. Further, it has been recognized that zoning regulations reasonable in substance and reasonably applied do, or are presumed to, promote the public safety, health, morals, welfare and prosperity and aid in community development. *County Comm'rs of Queen Anne's County v. Miles,* 246 Md. 355, 364; *Northwest Merchants Terminal, Inc. v. O'Rourke,* 191 Md. 171, 190-191. These recognitions take the form of a strong presumption of the validity and correctness of comprehensive zoning or rezoning. *Reese v. Mandel,* 224 Md. 121, 128; *Kahl v. Consolidated Gas, Elect. Lt. & Power Co.,* 191 Md. 249, 257. There cannot be validity and correctness in a comprehensive zoning plan unless it does promote the general welfare. It follows logically, as the decisions have held, that an attacker bears the heavy burden of overcoming the presumption that the legislative action was not in the interests of health, safety, morals or the general welfare. *Reese v. Mandel, supra.*

The conditional use or special exception, as it generally is called, is a part of comprehensive planning and shares the presumption that such a plan is in the inter-

ests of the general welfare and valid. *Huff v. Board of Zoning Appeals,* 214 Md. 48, 60-62.

In *Montgomery County v. Merlands Club, Inc.,* 202 Md. 279, 287, we went to some pains to stress that the special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to permit enumerated uses which the legislative body has determined can, *prima facie,* properly be allowed in a specified use district, absent any fact or circumstance in a particular case which would change this presumptive finding. We said: "The duties given the Board are to judge whether the neighboring properties and the general neighborhood would be adversely affected, and whether the use, in the particular case, is in harmony with the general purpose and intent of the zoning plan." In accord is *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 401-402.

It is our view that the Gaithersburg zoning ordinance, including its concept of the special exception, is substantially that in general use in Maryland. Article III, § 1 M, covers the Heavy Industrial Zone. It recites that "the exclusion of residential and commercial uses is intended to promote the economic welfare of the Town by reserving especially suited areas for industry and by controlling the intermingling of incompatible uses." Uses "permitted by right" include airplane manufacturing, breweries and distilleries, chemical manufacture, except of corrosive or other offensive acids, and a municipal sewage treatment plant and a municipal incinerator. Section 1 M then provides that:

> "The following uses are permitted as special exceptions after approval by the Board of Appeals, which shall determine that such a use will not unduly disturb or harmfully influence other uses in the area adjoining.
>
> * * *
>
> "2. Concrete or cement products manufacture.
>
> * * *

"8. Any other industrial use not otherwise specified, and any use which is obnoxious by reason of the emission of odors, gases, dust, noise or vibration, or by reason of danger of fire and explosion."

(Other permitted special uses include packing houses, scrap yards and automobile wrecking yards and coal distillation plants.) Article II of the zoning ordinance defines "Special Exception" as follows:

"A special exception is a use that would not be appropriate generally or without restriction throughout the zone, but which, if controlled as to number, area, location, or relation to the neighborhood, would promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity, or general welfare. Such uses may be permitted in such zone as special exceptions, if specific provision for such special exceptions is made in this zoning ordinance."

Article V, § 3, prescribes the powers of the Board of Appeals as to the granting of special exceptions. It is to hear and decide applications for special exceptions for uses which the ordinance specifically authorizes "and to grant special exceptions with such conditions and safeguards, as are appropriate under this ordinance, or to deny special exceptions when not in harmony with the purpose and intent of this ordinance." The Board is not to grant a special exception unless and until (1) a written application therefor, which states the basis of the request, is submitted, (2) the Planning Commission has reviewed the application and submitted a recommendation, (3) notice of a hearing on the proposal is posted on the property and in the Mayor's office and is published, and (4) a public hearing is held, and finally (5) there is a finding by the Board that it is empowered to grant the requested special exception and (although words ob-

viously have been inadvertently omitted) that its granting "will not adversely affect the public interest."

The Board's view that the burden was on the applicant to show affirmatively that the requested use will "promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity and general welfare of the community," was based on the use of the quoted words in the definition of a special exception. We do not share that view.

The legislative body of the City of Gaithersburg has in effect said that if certain standards and requirements enumerated in the ordinance are met in a particular case, the various special exceptions specifically authorized are a part of the comprehensive zoning plan and therefore promote the health, safety and general welfare, to the same extent as do the uses permitted as of right in the zone involved. Special exceptions can be a permissible zoning tool only when they, like all zoning, are a permissible exercise of the police power and so are in the general public interest and promote the health, safety or general welfare of the community. *County Comm'rs of Queen Anne's County v. Miles,* 246 Md. 355, 364; *City of Baltimore v. Cohn,* 204 Md. 523, 529-530. In its definition the legislature of Gaithersburg declared that a special exception use that gratified the standards and requirements of the ordinance did promote the general welfare and the courts will honor the presumption that the legislative body was right. Clearly the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements. *Board of County Comm'rs v. Luria,* 249 Md. 1, 3. But, as the Court said in *Bar Harbour Shopping Center, Inc. v. Andrews,* 196 N.Y.S.2d 856, 872, part of his burden is not "to show affirmatively that his proposed use accords with the general welfare." If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public inter-

est, he has met his burden. *Merlands, Oursler, Huff,* all *supra.*

We turn to the facts. The Board said that if there is no affirmative evidence of benefit to the community at large "then the extent of harm or disturbance becomes immaterial, unless it is shown there would be no harm or disturbance at all." The Board was only partially right because, although there is no need, as we have said, for the applicant to show affirmatively that the granting of his application would be a benefit to the community at large, the extent of the harm or disturbance to the neighboring uses and area does become material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But, if there is no probative evidence at all of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception is arbitrary, capricious and illegal. *Merlands, supra.* The case before us is in the latter category.

The property involved consists of some 155,000 square feet (3.6 acres). The proposed ready-mix concrete plant would stand on the rear 40,000 square feet on a site presently occupied by a mechanical pea picking operation. The southern boundary of the tract is the main line of the B. & O. Railroad. Across the tracks is the Federline plumbing supply company, including a warehouse, and a metal fabricating company. Across the street which bounds the property on the west is the entrance to the Montgomery County Fair Grounds, a building supply yard and a warehouse and other miscellaneous industrial and commercial uses. To the north is an apartment house owned by Mr. Federline, who owns the plumbing supply company, a non-conforming use built after a heavy industrial use already was established on the site of the proposed concrete plant.

The applicant produced testimony of an architect that

the plant would be designed and painted to blend into the area scene, of engineers and experts that it would need but one or two men to operate it, that it was of the latest design and would produce little if any noise above that already in the area, that it would be 99.9% dust free by reason of installation of expensive equipment, already proved fully effective in other operations, and guaranteed to be similarly effective here, which utilized covered conveyors and bins and vacuum cleaner-like bags that covered the trucks servicing the plant. There was further testimony on behalf of the applicant by fully qualified experts, including a police officer of Montgomery County whose headquarters were next to a similar but not as sophisticated plant in Bethesda, that the trucks that brought washed sand and gravel and cement to the mixing plant and the trucks that delivered the mixed concrete would add minimally and unobjectionably to the traffic on presently uncongested streets nearby. There was testimony by a fully qualified real estate expert that there would be no detriment to the area by reason of the presence of the plant and that there had been uninhibited commercial development adjacent to similar but less sophisticated plants in other areas of Montgomery County.

The evidence for the protestants was a memorandum of the planning commission, the testimony of two lay witnesses and a petition objecting to the proposed use signed by 240 residents of Gaithersburg. Taking them in inverse order, zoning is not a plebiscite. Mr. Federline the owner of the apartment complained, not because the proposed use would keep tenants away or irritate them, but because he feared, without specifics, that the heavy trucks would cause structural damage to his building. When asked if putting the truck routes further from the building would alleviate his fears, he indicated it would. In any event, a consulting engineer who specialized in the area of the response of structures to dynamic disturbance such as ground motions, earth shock, vibrations and blast effects, and who had unimpeachable qualifications,

opined categorically that Mr. Federline's apartment house "will suffer no adverse structural effects due to traffic or due to operation of the concrete plant," and that the ground motions and vibrations will in no way inhibit the future use, enjoyment or development of neighboring or surrounding property, or affect public safety, health or comfort.

The fourth source of testimony was an engineer, Mr. Rudy, engaged in nuclear research, a resident of Gaithersburg. He generalized that no operation could be 100% dust free and that the heavy trucks would adversely affect the roads and traffic in the area. "I don't think it [the proposed plant] belongs in the center of Gaithersburg." His fears were refuted by experts on roads and trucks.

All this in effect amounted to no evidence at all.

The memorandum of the planning commission offered no facts and in addition considered the application as one for a variance, not a special exception. The testimony of Messrs. Federline and Rudy amounted to unsupported dislike and fear of the project.

To deny the prima facie right of the property owner to enjoy the special exception, the Board would have had to have had before it evidence that the proposed use would "unduly disturb or harmfully influence other uses in the area adjoining" (Art. III, § 1 M of the ordinance) or evidence that the proposed use would not be "in harmony with the purpose and intent of this ordinance," or that the use would "adversely affect the public interest" (Art. V, § 3 B of the ordinance). There simply was no evidence of any of these things and abundant probative evidence to the contrary.

An objective reasoning mind could not reasonably find on the record before the Board that the application did not have to be granted. Therefore, withholding of the grant was arbitrary and legally unwarranted. *Board of County Comm'rs v. Oak Hill Farms, Inc.*, 232 Md. 274; *Merlands, supra.*

The case will be remanded to the Board for the grant-

194

ing of the applicant's application upon such conditions and safeguards as the Board finds appropriate under the ordinance and the evidence.

*Order reversed, with costs, and case remanded for further proceedings in accordance with the opinion herein.*