TURNER, etc. t/a Salisbury Venture
*v.* HAMMOND et al.

[No. 39, September Term, 1973.]

*Decided October 15, 1973.*

42

*Motion for rehearing filed November 12, 1973; denied November 12, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Hamilton P. Fox,* with whom were *Fulton P. Jeffers* and *Hearne, Fox & Bailey* on the brief, for appellant.

*Victor H. Laws,* with whom were *Long, Laws, Hughes & Bahen* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Captain John Smith sailed up the Wicomico River in 1608. When he came to what is now Salisbury he found a small community of Nanticoke Indians. They drifted away to the north in the face of later incursions of the white settlers. A century or so later their displacement seems to have been accomplished. In the summer of 1732 the Assembly passed an act "for the erecting a Town at the Head of Wiccomoco River ... in a Fork thereof" and empowering five commissioners to buy, for that purpose, a tract of 15 acres lying "most convenient to the Water." Our present concern is another 15 acre tract (the property) about a mile farther north but "convenient" to the very same "Water." [1]

---

1. Johnson's Pond, *infra,* was created by the construction of a dam across the North Branch of the Wicomico River at Isabella Street.

Differences of opinion about the use of the property have engendered a commotion the Nanticokes would likely have thought passing strange if, indeed, it could have been within their powers of comprehension.

We have filed with this opinion a part of the official map of Salisbury, reference to which is essential if the facts and circumstances of this case are to be understood. North has been indicated; the scale is 1″ = 1000′; the hachured area between Union and Hickory Avenues represents the property.

It will be noticed that the corporate boundary line of the City of Salisbury, the easterly shore of Johnson's Pond, and the southwestern boundary of the property are coincident. The area enclosed by Union Avenue, Emerson Avenue, Handy Street and the shore line is for the most part unimproved. In the area enclosed by North Division Street, Hickory Avenue, the property, and Union Avenue are single family dwellings, some as old as 60 years. St. Peter's Episcopal Church owns both the property and the abutting Parsons Cemetery.

It is conceded that the zoning classification of the property is Residential B.[2] Apartment houses are permitted in

2. Sec. 27 of the Zoning Ordinance is as follows:

"Sec. 27. Residential B districts — Uses permitted.

"In all residential B districts, land and buildings shall be used, and buildings shall be arranged, intended and designed to be used for one or more of the following specified uses which shall be classified as residential B uses:

1. Dwellings for one or two families
2. Church, parish house or convent
3. Club for civic, social, athletic, political, fraternal, literary, artistic or charitable purposes including the ordinary country club, with usual accessory uses operated solely by a recognized bona fide group in one of the fields mentioned herein for mutual benefit, not as a business and not for profit
4. Fire houses
5. Garage for not more than three motor vehicles and not over nine hundred square feet, except as provided hereinafter
6. Hospital, sanitorium and convalescent or nursing home, public or private, except for the insane, feeble-minded, infectious diseases or chronic alcoholics
7. Hotel and apartment house by ordinance permit only

residential districts provided a special use exception is granted by the Board of Zoning Appeals (Board). The criteria to be applied by the Board are set forth in Section 54:

"Buildings and uses, as special exceptions, limited as to location, and especially in the locations described below in this section, *are permitted* by the terms of this ordinance, *if the board of zoning appeals finds, that in its opinion, as a matter of fact, such exceptions will not substantially affect adversely the uses of adjacent and neighboring property permitted by this ordinance* and provided such exception is approved by the board:

\* \* \*

12. Apartment houses in residential districts as follows:

  a. A group of apartment houses

  b. A housing project of a group of apartment houses to be constructed as a unit according to a comprehensive well planned design, with adequate provisions for access of light and air to the apartments and to neighboring

---

8. Library, art gallery, community center noncommercial building or public museum

9. Municipal recreational use including public parks, athletic fields, playgrounds, tennis courts, golf course

10. Office of a physician

11. Office of other professional persons, and studio of an artist or musician for practice or teaching in his home, without advertising except a professional sign not over one square foot in size

12. Orphanage or home for the aged

13. Police station

14. Tourist home or boardinghouse

15. Y.M.C.A., Y.W.C.A. and similar uses

16. Other uses not of prima facie business, commercial or industrial character

17. In addition to the above classified residential B uses, those uses classified as residential A uses shall be permitted in the residential B district"

properties provided there is substantial compliance with the population density regulations of the district, and further provided that the aggregate area of the open yard spaces is substantially equivalent to the minimum aggregate area required for these buildings in this district and on the further condition that the buildings shall collectively and individually comply with front and rear yard regulations and that there shall be not less than thirty feet between buildings, and the buildings not less than thirty feet from adjacent property lines." (Emphasis added.)

The appellant (Turner) proposes to build on the property 197 garden apartment units in 12 groups of buildings, 67 in all, each two and one-half stories high. The plans call for 49 single bedroom units, 100 two bedroom units and 48 three bedroom units. On a parcel 120 feet by 450 feet along the southeastern boundary beginning at Union Avenue and extending 100 feet beyond Brooklyn Avenue there will be six single family dwellings. This, it is said, will provide a buffer zone between the apartment project and the existing dwellings. To this end Turner obtained from the church an option to purchase the property; subsequently he applied for the special use exception required by the ordinance. The Board, after a hearing, adopted the resolution set forth below, verbatim. It is at once obvious that the Board used a prepared form.

"Upon a motion by ___Verdin Cantrell___ seconded by ___Walter Phillips___ and duly carried, the Board ___denied___ the request for a Special Use Exception in the within case and as its reason for so doing states as follows:

"'We find from a preponderance of the evidence that the proposed use of this property for an apartment pro- ject consisting of 197 units

1. will ~~or-will-not~~ substantially affect adversely the uses of adjacent and neighboring property;

2. will ~~or-will-not~~ substantially affect adversely persons residing, studying, working, or otherwise occupying / buildings adjoining or in the
   lands or
   vicinity of the project area;

3. ~~will-or~~ will not be compatible with the character and use of buildings adjoining or in the vicinity of the project;

4. will ~~or-will-not~~ affect adversely the safe and efficient movement of traffic in and through the area by the use of existing street patterns;

5. ~~has-or~~ has not been so designed to minimize adverse affects on adjacent properties and the surrounding neighborhood;

6. ~~that-public-utilities-can-or-can-not-economically-be-extended-to-the-site-of-the-project;~~

6 7. that development in the neighborhood since the
   not
   zone plan and ordinance were adopted has / been such as to promote a change toward the proposed type of development.

"Thus by virtue of the requirements of Section 53 and 54 of the Ordinance No. 789 of the City of Salisbury, Maryland, the above findings require that the Special Use Exception be ____denied____ .

/s/ Michael J. Hynes        /s/ Oris W. Horsey Sr.

/s/ William H. Bull

/s/ Verdin S. Cantrell

/s/ W. L. Phillips "

On 7 February 1973 the Circuit Court for Wicomico County, Pollitt, J., affirmed the decision of the Board. From that order Turner has appealed. We shall reverse.

The hearing before the Board on 9 March 1972 appears to have been attended almost exclusively by opponents. Their reactions, whether favorable or unfavorable, were both vehement and vocal. There was received in evidence, before the testimony, a letter from the Wicomico County Fire Marshal, endorsed by the Deputy Fire Chief of the Salisbury Fire Department, stating that their joint inspection of the property enabled them to report that

"1.  The area in question would have adequate access to the site and within the site for fire fighting purposes.

2.  There will be installed adequate water mains and fire hydrants for fire fighting equipment.

3.  The proposed type of construction would lend little if any degree of hazard to other apartments or properties."

Turner, the first witness, described the project in general terms. Brick veneer would be used in the construction of the apartment buildings and each of the six single family dwellings would cost from $22,000 to $25,000. The apartment buildings, he said, would cover about 11.5 percent of the ground, the project would be conventionally financed, insured by FHA, and there would be no rent subsidies of any kind.

John M. Hilliard, an architect, testified he prepared the plans submitted to the Board. He said there were "close to 400" parking spaces, although the plans called for only 264. Cross-examination developed some uncertainty in respect of statistics but we think, in the circumstances, it had little, if any, significance.

What follows is an excerpt from the record:

"Mr. Creamer [Director of the Planning Office]: May we interrupt long enough to pass a pad around for these people . . .

"Mr. Hynes [Chairman of the Board]: Oh, yeah. We are going to pass a pad around for all those people that are present and we'd like you to put next to your name whether you are for or against the *variance* this evening. [Emphasis added.]

"Mr. Creamer: People's address.

"Mr. Hynes: Oh yes. Put your address down too. That's very important. *We'll disregard a name that hasn't got a location next to it.* Have you got a pencil and pad there. [Emphasis added.]

"Mr. Creamer: Merrill [Merrill J. Burhans, Jr., Supervising Planner] has it.

"Mr. Hynes: Merrill, why don't you start up in the box there. Want to call your next witness, Mr. Fox."

In the transcript of the record there are six pages of signatures, a total of 204 according to a note on page one, all registering opposition. The addresses given suggest the signers reside anywhere from several hundred yards to a mile or two from the property. Indeed one has trouble understanding how some of the signers can be affected one way or another by the project.

Carter Bertizon, a builder, testified that he expected to build the structures, that the cost would be about $2,500,000, that he would use local labor and that construction would be finished in two years.

Victor Stephens, a Salisbury realtor, was the next witness. He recited in considerable detail his investigation of the effect of apartment projects, similar to the proposed project, on the value of existing properties in the vicinity of such projects. He gave it as his "definite opinion that in all honesty a project of this sort should not be expected in any way to lower the value or harm the value of nearby residential property."

Harold Fulton has been Assistant Superintendent of the Wicomico County Schools since 1959. He said all of the elementary schools "operate at near capacity." If there is an increase in the number of children "we have to make some

adjustments to take care of them"; it is the responsibility of the school system, he added, "in some way, to make provisions for the children." Questioned about the traffic problem he replied, "if there is a problem, sir, this [the project] surely would not diminish the problem." Shifts in population require changes in school district boundary lines "almost every year" but, he said, "the children who live the closest to the school are the least affected." He laid it down quite firmly that the school system would take whatever steps might be necessary to accommodate whatever children came to live on the property.

Phillip C. Cooper is Salisbury's City Engineer and Director of Public Works. In respect of water he said it was "perfectly feasible and possible to extend adequate size mains to serve this development and in fact, improve the service in the area." He explained in some detail how the improvement would come about. In respect of sewer service he said it would be "feasible and possible" to provide adequate service to the area. The project, he added, would generate sufficient revenues to foot the bills. That "the area of North Division Street has traffic problems" is common knowledge; he went on to say, however, that "anything that happens in the northwest section of the city would to some degree affect the traffic problems. . . . We have conditions in North Division that would be affected adversely by any major increase in new homes in this area but we do feel that there are some corrective measures which can be taken to minimize the inconvenience. I think a competent traffic person *would not say* that these additional homes would create an impossible situation. It would aggravate an already difficult situation *unless improvements are made.*" (Emphasis added.) He thought about $30,000 spent on street improvements would "substantially help the movement of traffic in the area." Asked about the availability of water for fighting fires he said the "system is reasonably adequate all over town." He thought there might be problems on the dead-end streets (London and Brooklyn Avenues) but, of course, those problems would be solved if the service is to be improved as a result of the project.

Asked if he was aware of the fact that the residents of Brooklyn, London and Boston Avenues, having "few off-street parking facilities," were obliged to use the street for parking, Cooper replied that most of them do "have an off-street entrance." Moreover, he said, "there are alleys . . . and garages available for parking."

The last witness to testify on behalf of Turner was Dr. Walter Worthington Ewell, a consulting engineer whose expertise in the field of highway and traffic engineering was not challenged. In *Dundalk Holding Co. v. Horn*, 266 Md. 280, 291, 292 A. 2d 77 (1972), we said he was "well-qualified." He said he and his associates had made an extensive study of traffic in the area; his testimony and the exhibits he submitted seem to support his statement. He said that if traffic to the project from Union Avenue and from Union Avenue to the project could be prohibited, except in respect of emergency vehicles, to which Turner is quite agreeable, the increase in traffic on London and Brooklyn Avenues would be from 30 to 50 vehicles per hour. He characterized this as negligible. He gave it as his opinion that Division Street, at London and Brooklyn Avenues, is capable of absorbing whatever increase in traffic the project might generate.

William B. Briddell was the first witness produced by the appellees. His house is on Emerson Avenue about 500 yards northeast of the property. He produced a list of 22 houses built within "the past year." Half of them are north of the State Hospital, at least a mile away. Not more than two or three of the others are closer than one-third of a mile. His only complaint, really, had to do with traffic on Union Avenue.

The next witness, Gorman Hammond, has lived on Union Avenue opposite the elementary school for 25 years. He spoke of the "tremendous increase" in traffic on Union Avenue. He can park his car in his own driveway. He would rather not live near apartment houses but, he said, he could not afford to buy another house having "space and living conditions" equal to his old house. He agreed there would be little, if any, effect on Union Avenue traffic if residents of

the project were denied access to it. His opposition continues, unabated, however.

Robert Cannon has lived on Riverside Drive for about ten years. His house is a mile and a half to the south of the property. About six years ago (1964) the Oak Hill Townhouse project was built in the area between his house and the river. He thought it consists of 90 units. He recalled that a variance had to be obtained so as to allow a density greater than that allowed by the zoning classification. In the summertime, he said, there seems to be "two, three or four apartments that have hi-fi's going" and "ball games [are] going" on in the "back yard which backs up to [him]." He was of the opinion that "the value of . . . [his] property has decreased in value as a result of the apartments being built there, because of the increase of density, living conditions and the brick walls." He did not say how much his property had decreased in value. He did speak of a house on the other side of Riverside Drive which Stephens testified was bought in 1966 for $22,000 and sold in 1970 for $34,000. Cannon said he "understood" the owner paid $33,500 for it and sold it five years later for "$35,000 to $36,000." He conceded that all he knew about inflation was "what [he] read in the newspapers." He continues to live in the Riverside Drive house.

Why Robert Martin was called to testify for the appellees the record does not reveal. He lives on Emerson Avenue a little beyond Briddell. His testimony amounts to this, and only this — he is unhappy because his water pressure is low.

Alvin Hubbard has lived on Brooklyn Avenue between Boston Avenue and North Division Street for 20 years. There is an alley in the rear of his property running to Boston Avenue which he said is available to him but which is presently impassable by automobile because of fences and flower gardens put there over the years by himself and his neighbors. He is opposed to the project because he fears he may not be able to park his automobile in front of his house. While he could not "give a true guess" as to whether the project would depreciate his property he said it would cost an unspecified amount to open up the alley. The aerial photo

in the transcript suggests it would need to be opened for a distance of but 50 to 60 feet, the cost of which could hardly be prohibitive.

Rita Meise lives on Livingston Street. She discussed in some detail the traffic on Union Avenue and the difficulties caused by the school buses. She is opposed to the project because in the first place she doesn't "see a need for it" and in the second place she thinks "the area can live without it."

The next witness, Emil Hubeny, lives in the small block bounded by North Division Street, Union Avenue, North Salisbury Boulevard and Amber Street. He said every morning when he leaves for work he has "to wait 5 or 10 minutes to get out." "The noise now from the Boulevard is almost unbearable" and, he declared, at night the trucks "hit their air brakes" trying to stop for Naylor Street. He said the project would "devaluate" his property but he was not asked to say how much the devaluation would be nor did he suggest any amount. As a volunteer fireman he expressed doubt about "getting that equipment down these narrow streets in the area."

The president of the North Salisbury Elementary School Parent-Teacher Association, Dean Wells, was the next witness to appear. He lives in Pine Knoll Terrace which is four miles north of the property and three miles north of the city line. His children are bused to the school. He was allowed to read into evidence the following letter:

"Gentlemen: At the regular meeting of the North Salisbury School Parent and Teachers Association on Monday evening, March 6, 1972, a motion was made and unanimously passed opposing the zoning variance for the proposed apartment complex located on the property situated south of Union Avenue. The general feeling of the membership was that there presently exists a traffic hazard along Union Avenue and at the intersection of Union Avenue and North Division Street as well as Union Avenue and Route 13. There is much concern among the parents of the children

who attend North Salisbury School that the proposed complex would add greatly to this traffic hazard. Again, the North Salisbury School PTA wishes to voice its opposition to the proposed zoning variance for an apartment complex. Yours very truly, North Salisbury School PTA. Jean O. Truitt, Secretary."

There was no one present at the meeting to explain the project. He said "knowledge gained through the newspapers was brought to the meeting."

The appellees called as their final witness Matthew Creamer, whom we identified early on as the city's Planning Director; he does not consider himself to be a "traffic expert." Counsel read to him a number of excerpts, quite general in nature, from his 1970 "Neighborhood Analysis." He was asked if there was "any change in . . . [his] opinion in those statements since then." Creamer's reply is illuminating:

"I think there has been no change essentially since those passages were directed essentially towards the larger, older homes which are frequently broken up into apartments and because of the density problems on the individual lots. A greater number of dwelling units or apartments, if you will, on a single lot creates additional problems with off-street parking, more on an individual basis. *We weren't specifically directing those comments towards an apartment project as such is before us this evening but it could possibly apply as well.*" (Emphasis added.)

He conceded the density of the proposed project to be "well under [he also said "substantially under"] the maximum density in the Code for apartments in a Residential B District." He agreed also that the project complied with all specific regulations. Subdivided into single family lots, he said, the property would produce 60 to 80 lots depending on the street pattern.

In the court below the appellees put it rather strongly that Turner's appeal should be dismissed on either of two grounds, that his "hardship" was self-created or that there was no "proof of any change in conditions in the neighborhood to justify a repetitive application." In this Court they press only the latter ground. Judge Pollitt, in his opinion, said:

> ". . . The prior application was for 300 units *and* a variance for a mid-rise structure. The present application is for 200 units and *no variance.* The Board concluded that this was not substantially the same application and their findings on that issue should carry the same presumption of correctness as their findings on the merits. The question is moot, however, since the court will affirm the action of the Board on the merits."

We think Judge Pollitt's use of the term "moot" was imprecise. The question was presented to him and it required his consideration. He did consider it and quite obviously he did not share the views of the appellees. But whether viewed as action or non-action, his conclusion was adverse to the appellees. They have not cross-appealed, however, so the question is not before us. *Fennell v. G.A.C. Finance Corp.*, 242 Md. 209, 229, 218 A. 2d 492 (1966), and the cases therein cited.

Occasionally the bar and less often the bench lose sight of the concept that the conditional use or special exception, as it is generally called, is a part of the comprehensive zoning plan sharing the presumption that as such it is in the interest of the general welfare and, therefore, valid. *Rockville Fuel and Feed Co. v. Board of Appeals of the City of Gaithersburg*, 257 Md. 183,.187, 262 A. 2d 499 (1970). The special exception is a valid zoning mechanism that delegates to an administrative board a *limited* authority to permit enumerated uses the legislature has determined can be allowed, properly albeit prima facie, absent any fact or circumstance negating the presumption. *Rockville, supra.* In

*Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 287, 96 A. 2d 261 (1953), we said:

> ". . . The duties given the Board are to judge whether the neighboring properties and the general neighborhood would be adversely affected, and whether the use, in the particular case, is in harmony with the general purpose and intent of the zoning plan."

While the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements he does not have the burden of showing affirmatively that his proposed use accords with the general welfare. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material but if there is no *probative* evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the functioning of the comprehensive plan, a denial of an application for a special exception is arbitrary, capricious and illegal. *Rockville, supra.*

It will be recalled that in its present zoning classification the property can be used, *without* a special exception, for churches, clubs, including country clubs, fire houses, hospitals, sanatoria, nursing homes, physicians' offices, musicians' studios, artists' studios, orphanages, police stations, boarding houses, YMCA and YWCA facilities and similar uses. A group of apartment houses is specifically permitted as a special exception, if the Board finds, *as a matter of fact*, that the exception will not *substantially* affect adversely the uses of adjacent and neighboring property. Section 53 of the ordinance requires the Board to give consideration to "traffic conditions and accessibility to buildings for fire and police protection," light and air, the availability of water mains, sewers and other utilities.

We think the "reasons" given by the Board for denying the

56

application suggest a rather cavalier attitude in respect of its duties and responsibilities. It made no findings of fact worthy of the name and we think citizens are entitled to something more than a boiler-plate resolution. *See Baker v. Board of Trustees of the Employees' Retirement System,* 269 Md. 740, 309 A.2d 768 (1973).

This record is utterly devoid of any evidence that the design of the project does not "minimize adverse effects on adjacent properties and the surrounding neighborhood." Nor is there any evidence that the project "will not be compatible with the character and use of buildings adjoining or in the vicinity of the project" unless one has in mind the headstones and mausoleums in the adjoining cemetery, the hospital across Johnson's Pond, or the elementary school on the other side of Union Avenue. Alvin Hubbard is fearful he will not be able to park where he pleases but aside from his petty plight there is no evidence of a substantially adverse effect on "persons residing, studying, working or otherwise occupying land or buildings adjoining or in the vicinity of the project area." The sixth reason, in the circumstances of this case, would be characterized by a Mexican as *demasiados palabras.*

Commenting on the Board's finding that the project will "affect adversely the safe and efficient movement of traffic in and through the area by the use of existing street patterns," Judge Pollitt, in his opinion, said:

"Lay witnesses testifying to traffic problems in the area included William Briddell, Gorman Hammond, Alvin Hubbard, Emil Hubeny, and Dean Wells.

"As opposed to this testimony, the Applicant presented testimony from Dr. Worthington Ewell, a Consultant in Traffic Engineering, who conducted a survey for the Applicant and concluded generally that the proposed use would not unduly affect the traffic problem in the area. With all due respect to Dr. Ewell's opinion, the Board was not bound to

accept it and the question of adverse traffic conditions was certainly 'fairly debatable.'

".. . Without detailing further the evidence before the Board, the Court finds that there was substantial evidence before the Board to support its finding . . . ."

Both the Board and the learned trial judge seem to have lost sight of Turner's proposal to deny access to Union Avenue, except for emergency vehicles, and use only Brooklyn and London Avenues for ingress and egress. Even a cursory glance at the map makes it at once obvious that London Avenue should be one-way outbound with left turns prohibited at Division Street and that Brooklyn Avenue should be one-way inbound with right turns only from Division Street. Moreover there would seem to be no reason why some use could not be made of Hickory Avenue. It is in this light that the testimony of the appellees' witnesses must be viewed. Briddell spoke only of the traffic on Union Avenue. Hammond conceded the project would have little, if any, effect on Union Avenue traffic if access to it is denied. The little that Hubbard said about traffic had nothing to do with the safe and efficient movement of it or any adverse effect on it. Hubeny was concerned only with the fact that on occasions, at the peak hour in the morning, he is obliged to wait "5 or 10 minutes to get out" of his driveway on the east side of Division Street. Wells, in addition to reading the PTA letter, spoke only of school traffic on Union Avenue. Martin said nothing about traffic and Rita Meise confined her remarks to the school buses on Union Avenue and the parking of teachers' cars on Emerson Avenue. Nowhere do we find any contradiction, much less rebuttal, of Dr. Ewell's testimony that Division Street is capable of absorbing whatever increase in traffic the project might generate. Nor was there any rebuttal or contradiction of Mr. Cooper's testimony that $30,000 spent on street improvements would improve the movement of traffic in the area. Most of the improvements to the Division Street intersections and the widening of Division Street, he

added, "would have to accompany *any* major develop-
ment in the area." (Emphasis added.)

In *Bowie v. Board of County Comm'rs of Howard County*,
253 Md. 602, 616-17, 253 A. 2d 727 (1969), we said:

> "Traffic congestion is 'certain to be caused if this
> rezoning is granted' argue appellants. It must be
> supposed, of course, that the volume of vehicular
> traffic will substantially be increased by GE's
> activities. But it must also be supposed that the
> proposed new roads (Interstate 95, new Route 175
> and the New Berger Road) will be able to handle
> the increased volume well enough to avoid
> congestion. In any case there is uncontroverted
> testimony to that effect. In this regard, what we
> said in *Marcus v. Montgomery County Council*, 235
> Md. 535, 541 (1964), seems to be apposite:
>
>> "'Appellants draw attention to the claim
>> that commercial and apartment zoning is
>> likely to bring more people to a given area
>> and that as a consequence the traffic and
>> school population will increase, and that those
>> members of the neighborhood using the local
>> school and shopping area will suffer from the
>> consequent traffic congestion and over-
>> populated school facilities. These are in-
>> conveniences likely to be suffered by any
>> member of the public, far or near, and do not
>> require a denial of the application.'"

It scarcely needs to be added that it must be supposed here
that the improvements contemplated by Mr. Cooper "will be
able to handle the increased volume well enough to avoid
congestion."

Judge Pollitt, in his opinion, after discussing the traffic
situation, went on to say:

> "It is not necessary, however, to rely on that
> finding [traffic] alone.
>
> "In order for the Board to grant a Special Use

Exception, Section 54 of the Ordinance requires that it find as a matter of fact that such exception will not substantially affect adversely the uses of adjacent and neighboring property. Various residents of the area and other witnesses testified to the already overcrowded school that could not expand to absorb the increased number of children, the depreciation of economic values which would be caused by the project, the difficulty of access for fire-fighting equipment, the adequacy of water systems, and that the development in the neighborhood had not changed from single-family development since the Ordinance was adopted."

Mr. Fulton's testimony is neither contradicted nor rebutted. He stated categorically that the school system would take whatever steps might be necessary to make provision for the children. Mr. Stephens's testimony in respect of values has not been overcome. Robert Cannon's testimony was confined to an unsupported opinion in respect of his own house vis-a-vis an adjoining apartment project demonstrably not comparable to the project. Moreover, he expressed no opinion whatever as to what effect the project could be expected to have on the values of neighboring properties. Alvin Hubbard did not have an opinion. Emil Hubeny's testimony in this regard is not to be taken seriously; if he is to be believed, his property is already "devaluated" far beyond any effect the project could possibly have upon it. As has been said, neither the city nor the county fire department found any fault with the property or the project. Hubeny merely thought it possible that some difficulty might be experienced in traversing a narrow street. The availability of water and sewerage is clearly not an issue. Nor is the absence of any change in the development of the neighborhood away from single-family dwellings.

There can be little doubt that Turner's project is anathema to several hundred citizens. Our inspection of the list of names, however, leads us to suspect that not everyone

in the neighborhood is of like mind. But we have said countless times that these matters cannot be resolved by a plebiscite. If the residents do not want apartments they should prevail upon the local legislature to change the ordinance. The property owner has a prima facie right to enjoy the benefits of the special exception if he brings himself within the specific requirements of the ordinance. To deny him this right the Board must have had before it evidence that the proposed use "will substantially affect adversely the uses of adjacent and neighboring property permitted by this ordinance." *Rockville, supra.* There is no such evidence and there is abundant probative evidence to the contrary.

We have said that substantial evidence is required to support the findings of the Board and that substantial evidence is more than a scintilla of evidence. *Prince George's County v. Meininger,* 264 Md. 148, 152, 285 A. 2d 649 (1972), and *Kirkman v. Montgomery County Council,* 251 Md. 273, 277-78, 247 A. 2d 255 (1968). All definitions of scintilla, at least in this context, are imprecise but if we assume it takes ten gossamers to make a scintilla then the appellees' evidence before the Board falls well short of five gossamers.

The case will be remanded to the Board for the granting of Turner's application for a special exception upon such conditions and safeguards as the Board may find appropriate under the ordinance and the evidence.

> *Order reversed.*
> *Case remanded for further pro-*
> *ceedings conformable to the*
> *views expressed in this opinion.*
> *Costs to be paid by the appellees.*