MARION X. MILLER ET AL. *v.* KIWANIS
CLUB OF LOCH RAVEN, INC.

[No. 200, September Term, 1975.]

*Decided December 2, 1975.*

The cause was submitted on briefs to ORTH, C. J., and GILBERT and MELVIN, JJ.

Submitted by *W. Lee Harrison* and *Cooper C. Graham* for appellants.

Submitted by *Ernest C. Trimble* for appellee.

MELVIN, J., delivered the opinion of the Court.

This is an appeal from the order of the Circuit Court for Baltimore County reversing the action of the County Board of Appeals of Baltimore County denying the petition of Kiwanis Club of Loch Raven, Inc. (Kiwanis) for a special exception to operate a day camp upon a 75 acre tract of land zoned R.D.P. (Rural Deferred-Planning) located on the south side of Baublitz Road approximately 1468 west of Dover Road, in the Fourth Election District of Baltimore County.

Section 1A00.2B (10) of Article 1A (Rural and Rural-Suburban Law — Intensity Zones) of the Baltimore County Zoning Regulations provides that in an R.D.P. zone, among other uses permitted as special exceptions, are the following:

"10. Golf courses, country clubs, or other outdoor recreation clubs; also quasi public camps, including day camps".

The Kiwanis Club's petition for a special exception, in addition to the special exception for a day camp under Section 1A00.2B(10), also requested a special exception for a "community building and swimming pool, etc." on 24 acres comprising part of the 75 acre tract under Section 1A00.2B(b) which permits land in an R.D.P. zone to be used by way of a special exception for:

"6. Community buildings, swimming pools, or other structural or land uses devoted to civic, social, recreational, or educational activities".

Kiwanis had acquired the 24 acres in 1964 from the Spring Valley Country Club which had operated a pool and country club thereon since about 1959. Kiwanis continued the swimming pool operation, apparently as a non-conforming use (although there is some indication it was not a legal non-conforming use), and the principal reason for requesting the community building and swimming pool exception was to "legitimize" its present operations on the 24 acres.

The County Board of Appeals granted the special exception for the community building and swimming pool, subject to restrictions concerning their operation. No appeal was taken from that decision. As already stated, however, Kiwanis appealed to the Circuit Court for Baltimore County the denial of the special exception for a day camp which it wishes to operate on the remaining 51 acres. It appears, however, that the swimming pool facilities would also be used to some degree by the day campers.

The 51 acre tract is contiguous to the 24 acre tract and was acquired in 1971, at which time it was being operated as a farm by the former owner.

Sections 502.1 and 502.2 of the county zoning regulations set out the applicable provisions dealing with the granting of special exceptions in Baltimore County:

"502.1 — Before any Special Exception shall be granted, it must appear that the use for which the Special Exception is requested will not:

a. Be detrimental to the health, safety, or general welfare of the locality involved;

b. Tend to create congestion in roads, streets, alleys therein;

c. Create a potential hazard from fire, panic or other dangers;

d. Tend to overcrowd land and cause undue concentration of population;

e. Interfere with adequate provisions for schools, parks, water, sewerage, transpor-

tation or other public requirements, conveniences, or improvements;

f. Interefere with adequate light and air.

502.2 — In granting any Special Exception, the Zoning Commissioner or Board of Zoning Appeals [1] upon appeal, shall impose such conditions, restrictions, or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties. The owners, lessees or tenants of the property for which a Special Exception is granted, if required by the Zoning Commissioner, or Board of Zoning Appeals, upon appeal, shall enter into an agreement in writing with said Zoning Commissioner and/or the County Commissioners of Baltimore County, stipulating the conditions, restrictions, or regulations governing such Special Exception, the same to be recorded among the land Records of Baltimore County. The costs of such agreement and the cost of recording thereof shall·be borne by the party requesting such Special Exception. When so recorded said agreement shall govern the exercise of the Special Exception as granted, as to such property, by any person, firm or corporation, regardless of subsequent sale, lease, assignment or other transfer."

In *Turner v. Hammond,* 270 Md. 41ͅ 60 (1973) the Court of Appeals said: "The property owner [applicant for a special exception] has a prima facie right to enjoy the benefits of the special exception if he brings himself within the specific requirements of the ordinance". In *Anderson v. Sawyer,* 23 Md. App. 612 (1974) this Court, speaking through Judge Davidson, discussed the applicable standards for judicial review of the grant or denial of a special exception, as

---

1. Pursuant to other provisions of the regulations the Board of Zoning Appeals is now known as the County Board of Appeals, with all the powers and functions of the Board of Zoning Appeals.

explicated by numerous decisions of the Court of Appeals, including *Turner v. Hammond, supra.* Judge Davidson said, at 617:

"The conditional use or special exception is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. *Rockville Fuel, supra,* at 257 Md. 191, 262 A. 2d 503. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an

application for a special exception is arbitrary, capricious and illegal."

Applying these standards to the case before us we find that the Board's action in denying the special exception for a day camp was unsupported by substantial evidence and was not fairly debatable. We shall therefore affirm the judgment of the trial court reversing that action.

Kiwanis' purpose in acquiring the 51 acres was described by Mr. Walter E. Williams, a member of the Kiwanis committee "that worked on the acquisition of the farm property":

". . . When the club became aware that Mr. Baublitz, the former owner of the farm, was interested in selling the farm, we as a property owner were concerned about what would happen to this 51 acres, as I am sure everyone else in the neighborhood was concerned. We felt that the area which is now a golf course on one side, and our pool on the other, and generally an open space area, should be preserved.

For this reason we became interested in acquiring the farm, both in terms of our concern, I think for our own property value, but also in concern for the area in which we are situated. We felt that keeping this space, which now consists not only of our own but also other open areas and open space, would be a real community service.

Therefore we negotiated with Mr. Baublitz, who had indicated that he might sell the property to developers.

He gave us, however, the first option to buy, and we purchased the property for the purpose of preserving open space at that time.

Q. What are the plans that the committee has developed, and what did they do in anticipation of being able to operate a day camp?

A. Well, we felt that as part of this operation

that the space should be used in some way that would be useful for the community, and investigated a number of things. We made trips to day camps, we made a trip to a Kiwanis camp that is in Richmond, Virginia.

Since it was a farm, we talked with the County extension agents as to the possibility of potential uses to maintain it as a farm setting.

Q. (By Mr. Reiter) Out of curiosity, was this investigation made after you purchased and settled for the property?

A. It was concurrent. We did not purchase the property until we felt that there would be some useful purpose served for the community.

The final decision regarding using it as a day camp, however, was after we purchased it, but as part of our purchase we felt there would have to be some use of the property to meet some of the expenses of having purchased this open space, — mainly the mortgage."

---

". . . We also considered utilizing the property for senior citizens, for their benefit, which is another one of the aims of Kiwanis at this time. *We decided that the most practical thing to do, and also something of value to the community, was to create a day camp for children from 7 to 11,* as there do not appear to be these kind of resources, to any large degree, in Baltimore County.

Q. (By Mr. Reiter) Girls and boys?

A. Girls and boys, yes. We also decided that it would be most appropriate to preserve the farm atmosphere that exists already, in terms of preserving the environment as it now exists, and therefore we could continue to have some modest kind of farm operations, like planting corn and perhaps one or two, maybe more, animals, — that

would preserve a farm setting for both senior citizens, perhaps to come to, have a regular activity, *a day-to-day camp for 8 weeks a year, Monday through Friday, and not on the weekends.*

This would be for not more than, and this really boggles our imagination, to expect to get 150 campers. We anticipate, in reality, that it would be somewheres between 50 and 100 campers who would utilize the property.

We would have these campers do things, like plant trees and do other things that would improve the environment, and we would supervise groups, we would permit the Boy Scouts to come into the property and perform that activity, insofar as programs.

*All of this would be done under the supervision and control of a full-time manager, at the property, whose responsibility would be to see that these activities were controlled, that they did not create any problems for anyone, and would not in any way be a detriment to the neighborhood."* (Emphasis supplied.)

Mr. Henry F. Krautwurst, "hired as a camp director for our hopefully day camp on our Kiwanis Farm" testified further concerning the proposed operation of the day camp:

"Q. Will you give the Board the benefit of what you would hope, what kind of operation you would hope to have and the program for the children, and how it would be conducted, and so forth?

A. Okay. *The program is based as a day-camp operation. It is intended that the children will arrive in the morning around 9:00 o'clock, and spend the entire day at the farm, and leave at 4:00 in the afternoon.*

*When they arrive, we start out, I imagine, with swimming lessons in the morning.* Then the day would progress and we would have activities like

different types of ball games, softball, volleyball, badminton, archery, nature studies, arts and crafts, and some supervised free activity on the farm."

---

"Q. (By Mr. Reiter) What are your projections for your camp, for its use, the numbers and quantities?

A. If we can get 50 children out there and keep it at 50 children, I think we will be going good for a while, insofar as the day-camp program is concerned.

Q. Do you have any input as far as the economics of it is concerned, is that a feasible number?

A. Let me refer to some information.

Now the camping season is 8 weeks long. As long as we keep our enrollment at 50 campers per 2-weeks' session, that will give us an overall total number of 200 campers for the summer.

Q. (By Mr. Trimble) *Fifty for 2-week sessions, with 4 sessions, that would be 200 children. So that would be 200 children that would pay for the summer?*

Q. (By Mr. Parker) *Actually it would be your optimum number at any one time, 50?*

A. *That is what we are striving for.*

Q. *On any given day you would want 50?*

A. *Yes. That is the way I can see it, and that is the direction in which we are going."*

---

"Q. Do you have any plans, incidentally, for the transportation, if we have a day camp?

A. Yes, we had planned on using a school bus.

Q. They, the children, would accumulate at some church, and come out on the bus?

A. Yes. *We would prearrange pickup points and pick the children up, and bring them out to the camp in a school bus."* (Emphasis supplied.)

In denying the special exception for the day camp, the majority of the Board [2] gave as its only reasons: "It would seem inequitable to extend the quasi-commercial use of this property further until such time as the Kiwanis Club has proved itself to be good neighbors by the proper operation of the swimming pool and community building. *The Petitioner, from the evidence presented, does not seem able to assure the principles set out in Section 502.1.* Same are necessary if this special exception is to be granted." (Emphasis added.) We are not told by the Board which, if any, of the specific requirements of Section 502.1 the proposed use of the property fails to meet.

We hold that there was no substantial or probative evidence warranting the Board's conclusion. On the other hand, there was evidence from the Baltimore County Office of Planning and Zoning that the "requested use is compatible with the surrounding land use character"; evidence from an expert real estate appraiser, familiar with the area, "that this land, this total acreage, to be in the hands of the Kiwanis Club, to be developed in the way it is proposed to be developed, will enhance the value of the adjoining properties"; and a report from the Board of Education of Baltimore County that the special exception would result in "no adverse effect on student population." There was also affirmative evidence from the Maryland State Department of Health and Mental Hygiene that the day camp would not be "detrimental to the health, safety, or general welfare of the locality involved" and would not "tend to overcrowd land and cause undue concentration of population".

The chief concerns of the protestants seemed to be a fear that, since the property was not served by public water and

---

2. One member of the three-member Board dissented.

sewer facilities, the water taken from the Kiwanis' wells would eventually cause a deficiency in the water supply of neighboring properties, and that the Kiwanis' sewerage facilities are inadequate to prevent overflowing the septic system, potentially causing health problems in the form of pollution of neighboring well water and streams.

With respect to the water supply, the evidence is that water is supplied from two drilled wells, one 373 feet deep and the other 342 feet deep, and that Kiwanis has never had any problem with water supply for its operations on the property. There was no probative evidence that Kiwanis' use of its wells has had any adverse effect on the wells of any adjoining properties, or that the day camp would have any such effect.

With respect to Kiwanis' sewer system, there was evidence that in the summer of 1973 there was "a sewerage overflow at the swimming club". It is uncontradicted, however, that this was accidentally caused by heavy trucks running over and crushing a portion of the underground system. The system has been repaired by installing "a brand-new distribution box" and "all new piping" and "an additional seepage pit", making a total of seven seepage pits. A report from the Department of Mental Health and Hygiene, made before the seventh pit was installed, stated:

"Except for a period when only two of six seepage pits were working following the accident, the six pits have satisfactorily taken the sewage load of existing populations at the pool. A plan is soon to be set in motion to put in an additional seepage pit. A total of seven pits will insure proper sewage disposal at this location. *Such plans and installations are subject to approval of the county health authorities.*" (Emphasis supplied.)

One of the protestants testified that his examination of the applicable provisions of the Baltimore County Plumbing Code and information he obtained from "local well drilling companies" led him to the conclusion that granting the

special exception (including the swimming pool and community building) would result in the *"probability* that the present ground water table will be lowered to a point where many adjacent property owners' well will run dry" and "the *probable* inability of the ground to absorb 36,500 gallons per day of sewage and swimming pool waste will result in pollution of the present spring fed stream located at the rear of the property". As we have noted, there is no evidence that those feared conditions presently exist, nor indeed that there is more than a possibility (as opposed to probability) that they will ever exist. Under the circumstances such fears cannot be deemed substantial or probative evidence supporting the Board's denial of the special exception. *Montgomery County v. Merlands Club*, 202 Md. 279, 291-292 (1953).

Most of the testimony before the Board concerned that portion of the special exception relating to the community building and swimming pool. As we have stated, there was no appeal by any of the protestants from the granting of that special exception. There was much testimony by the protestants concerning the traffic congestion caused by the swimming pool operation and the expressed fear that the day camp would make a bad situation worse. A report in evidence from the Baltimore County Department of Traffic Engineering stated that "No major traffic problems are anticipated by the requested special exception for a community building, swimming pool, and outdoor recreational club [including a quasi-public day camp for Kiwanis Club]". In view of the fact that the day campers are to be transported in buses or car pools it seems patent that granting the special exception could hardly be said to "tend to create congestion in roads, streets, therein". (Section 502.1b). In addition, we note that there are many uses permitted as a matter of right in an R.D.P. zone (without the requirement of a special exception therefor) which would undoubtedly create as much or more traffic than a day camp, operating eight weeks of the year with 50 children on 75 acres at any one time. Among these permitted uses are "one-family detached dwellings",

"Hospitals" and "Schools". As we said in *Gowl v. Atlantic Richfield Co.*, 27 Md. App. 410, 417 (1975):

> "We recognize that traffic impact is a sufficient basis to deny a zoning application, including an application for a special exception. *Templeton v. County Council*, 21 Md. App. 636, 321 A. 2d 778 (1974); *Temmink v. Board of Zoning Appeals*, 212 Md. 6, 128 A. 2d 256 (1956); *Hardesty v. Zoning Board*, 211 Md. 172, 126 A. 2d 621 (1956). But traffic impact on an application for a special exception ought to be measured against that which could arise under permissible use, and not merely on existing traffic loads around the undeveloped premises. Where, as here, the potential volume of traffic under the requested use would appear to be no greater than that which would arise from permitted uses, we believe it arbitrary, capricious and illegal to deny the application for special exception on vehicular traffic grounds."

With regard to the Board's statement that permission to operate the day camp should await "such time as the Kiwanis Club has proved itself to be good neighbors by the proper operation of the swimming pool and community building", we can only assume the Board has in mind the possibility that Kiwanis will not abide by the restrictions placed upon it by the Board's order granting the special exception for the swimming pool operation on the 24 acres.[3]

---

3. These restrictions were:

"1. That all operations and activities of any kind shall cease upon the subject property no later than 11:30 p. m. each day.

2. The public address system shall not operate after 10:00 p. m. except in the case of clear emergency. The public address system must be controlled at all times under the close supervision of the pool manager so as not to create a nuisance in the community.

3. That a site plan be approved by the Department of Public Works and the Office of Planning and Zoning, and any other pertinent County agencies.

4. The Health Department shall closely monitor the water usage

These restrictions effectively blunted [4] what appeared to be the more serious objections to the special exception voiced by the protestants, not only to the swimming pool operation but the day camp as well, those objections being noise from the loud speaker system and the fear of sewerage system deficiencies causing health problems, as well as to some degree the fear of a water deficiency in the area. If an applicant for a special exception meets its burden of satisfying the requirements of Section 502.1, as we think Kiwanis has in the present case, we find nothing in the Baltimore County Zoning Regulations placing upon it the added burden of proving that it will be "a good neighbor". To impose such a burden can only be termed illegal. To deny the special exception because the Board may think that burden has not yet been met is, in a legal sense, arbitrary and capricious.

While we shall affirm the trial court's reversal of the denial of the special exception for a day camp, we think it was inappropriate for the court to have itself imposed "conditions and restrictions" upon the use of the property for that purpose. Md. Rule B12 provides that in hearing appeals, such as this, the trial court "shall affirm, reverse or modify the action appealed from, remand the case to the agency for further proceedings, or dismiss the appeal as now or hereafter provided by law". We do not intimate the conditions and restrictions imposed by the trial court were reasonable or unreasonable.[5] Rather we think the case should be remanded to the Board to, pursuant to Section 502.2, "impose such conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties". The imposition of

and the proper functioning and full operation of the private sewage disposal system. This Special Exception is contingent upon the property owner obtaining all the necessary permits from the regulatory agencies, particularly the County and State Health Departments."

4. Perhaps accounting for no appeal by the protestants from the Board's Order.

5. The same conditions, among others, were imposed by the Zoning Commissioner, who had granted the special exception for the day camp.

such conditions in the first instance is properly the function of the zoning authorities rather than that of the courts.

> *Order reversing denial of special exception affirmed; case remanded for further proceedings conformable to the views expressed in this opinion.*
>
> *Costs to be paid by appellants.*