CELANESE CORPORATION OF AMERICA *v.*
BARTLETT ET AL.
(Two Appeals in One Record)
[No. 185, October Term, 1951.]

398

*Decided July 15, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*William A. Gunter* for the appellant.

*James N. Phillips*, with whom were *Hall Hammond, Attorney General,* and *Aaron A. Baer, Special Assistant Attorney General,* on the brief, for the Maryland Employment Security Board.

MARKELL, J., delivered the opinion of the Court.

These are two appeals from an order affirming two decisions of the Employment Security Board of Maryland and dismissing appeals therefrom. Both claimants, Mrs. Bartlett and Miss Arthur, had been employed by the Celanese Corporation, appellant. It is a matter of common knowledge that for some years Celanese's operations and the number of its employees have fluctuated but have been greatly decreased. A collective bargaining agreement between it and the union, dated August 8, 1950, provides, *inter alia,* that "the employer will pay technological displacement allowance to employees displaced by technological changes" upon terms and conditions specified. A previous bargaining agreement had contained provisions generally similar but appreciably different in terms and conditions. Technological displacement is defined as not including "any jobs temporarily discontinued because of trade conditions such

as lack of demand for any of" Employer's products. For some time before August, 1950 many jobs had in fact been discontinued and the holders "furloughed", *i.e.*, discharged subject to seniority rights to reemployment when available. Article 16, sections (c) (d) and (e) provide, "(c) When one or more employees are to be permanently displaced by the discontinuance of their jobs due to such technological change, the Employer will promptly notify the Union giving the details of the change, an estimate of the number of jobs abolished, and the approximate date of the change. A notice will be posted in the department stating the nature of the technological change and the number of jobs abolished. Employees of the affected subdivision, exclusive of those on furlough, shall have the right for a period of one (1) week from the date of such notice to apply in writing to the Personnel Department for payment of technological displacement allowance. If the number of applicants is greater than the number of jobs abolished, those applicants with the greatest seniority, in a number equal to the jobs abolished, shall be paid technological displacement allowance. If the number of applicants for technological displacement allowance is less than the number of jobs abolished, then junior employees in a number equal to such difference between those electing to receive technological displacement allowance and the number of jobs abolished shall be furloughed in accordance with seniority. If, as a result of the procedure mentioned above the furlough list has been increased, then a number of employees on such list equal to the number added to the list as a result of the technological change shall have the option of accepting technological displacement allowance or remaining on the furlough list. Employees on the furlough list shall be contacted in the order of seniority and each shall be given three (3) days in which to decide whether to remain on the furlough list or accept technological displacement allowance. In the event all employees elect to remain on the furlough list, the Employer shall be deemed to have

discharged its obligation under this section of the Agreement. (d) If an employee displaced by technological change chooses to take technological displacement allowance and thereafter is reemployed at another job by the Employer, he shall be reemployed as a new employee without credit for previous seniority or service. (e) To employees displaced by technological changes who have two years or more of service, technological displacement allowance will be paid on the basis of one week's pay for each year of service. The Employer agrees to inform the Union of the names and amounts paid to employees electing to take technological displacement allowance." By virtue of the provisions of section (e) the option given by section (c) to "those applicants with the greatest seniority", and to "employees on the furlough list * * * in the order of seniority" was given to those employees whose technological displacement allowances were largest (in time). The last paragraph of section (c) illustrates the fact that "permanent abolition" of a job by technological displacement involves no reduction in actual employment but only reclassification of jobs "temporarily discontinued" as "permanently abolished" and corresponding payment of "technological displacement allowance". Thus Article 16 subjected no employee or furloughed employee to loss of a job but only gave them options to receive payment of "technological displacement allowance" on voluntary termination of employment.

On September 22, 1950, Employer, pursuant to the provisions of Article 16, section (c), of the Agreement posted a notice that there were seventy-six jobs in the Twisting Section of the Textile Department which had been permanently abolished as of September 11, 1950, and that employees of this sub-division (not on furlough) had the right for one week to apply for payment of technological displacement allowance.

Mrs. Bartlett had been employed as a machine operator in this sub-division since August 3, 1938. Seniority rating is governed by division and sub-division seniority

and is, therefore, not plantwide. Mrs. Bartlett's name therefore was near the top of the seniority list of four hundred employees in the subdivision. She could have continued to work had she chosen to do so. However, in accordance with the option in article 16, section (c), she elected to terminate her employment and on September 29, 1950 made written application for technological displacement allowance. On October 10, 1950 she collected her allowance, amounting to $563.20, the equivalent of one week's pay for each year of her services, and signed a receipt for this payment as "received on my choice to accept separation allowance rather than a place on Seniority or Preferential Hiring List and on the understanding that this payment terminates all Seniority and Service rights."

On October 11, 1950 claimant applied to the Board for unemployment compensation. The claim examiner held her disqualified under section 5 (b) of the Act (Art. 95 A) until she "has become reemployed and has earnings therein equal to at least ten (10) times her weekly benefit amount", because her unemployment was "due to her leaving work voluntarily without good cause". On claimant's appeal, the Referee affirmed the determination of the Claims Examiner. On claimant's appeal to the Board, the Board first denied her request for review, and later "found that claimant was unemployed because of a lack of work and any benefits which may be paid to her should be charged against the experience rating account of the Celanese Corporation" and held, "The claimant is unemployed because of lack of work, and did not voluntarily leave work without good cause", and reversed the Referee's decision, but held that "claimant received wages with respect to the eleven weeks immediately following September 29, 1950 [i.e., technological displacement allowance] and, therefore, is ineligible to receive unemployment compensation benefits from September 29, 1950 to December 10, 1950". Employer appealed from the Board's decision to the lower court.

Claimant was [in 1950] fifty-three years old. Before the referee she testified that she had been "hospitalized" three times in nine months, she thought she could take her separation pay, and get a lighter job. Her physician had told her she must have lighter work. She had had double pneumonia. Apart from the state of her health, she had no complaint about her work. "I mean, it was heavy and it was hard. It was nice work. * * * I hated to give up my job at the plant."

In this court two questions have been argued, (I) Was claimant entitled to benefits? (a) Was she disqualified, under section 5 (b) because "her unemployment was due to her leaving work voluntarily without good cause"? (b) Was she eligible, under section 4(c), as being "able to work and available for work"? (II) If she was entitled to benefits, was Employer's account, for the purposes of the experience rating provisions of the act, chargeable with her wages?, or had she, within section 7(c) (7), "left the service of the employer voluntarily without good cause attributable to her employer"? or had she "left * * * the service of the employer by reason of any occurrence for which she was or might have been disqualified for benefits under the provisions of section 5"? These questions involve questions of construction of the act on which we have been cited no case in this court, and have found none, but on which there are decisions, sometimes conflicting or variant, in other jurisdictions under more or less similar statutes. For instance, does "leaving work voluntarily without good cause", in section 5(b), mean the same or less than "leaving work voluntarily without good cause attributable to her employer" in section 7(c) (7)? In *Morrell & Co. v. Unemployment Compensation Comm.*, 69 S. D. 618, 13 N. W. 2d 498, it was held that the language of section 7(c) (7) was merely declaratory of the meaning of the language of section 5(b), and that the latter, before amendment, meant the same as the former substituted by amendment. In *Sturdevant Unemployment Compensation Case*, 158 Pa. Sup. 548,

45 A. 2d 898, 901, it was held that a provision such as section 7(c) (7), relating to experience rating, could not operate to affect the meaning of a previous provision, such as section 5(b), but that "without good cause" meant not only "good cause attributable to the employer" but good cause personal to the employee, *e.g.*, bad health or the desire of a wife to be near her soldier husband. The court, however, added, "It must be understood, at this point we must underline it, that a determination that an employee has left his employment voluntarily with good cause does not of itself entitle the employee to compensation benefits. He must also meet the availability-for-work test provided by the statute. In many, probably in most, instances, the same cause that justifies an employee in leaving an employment will also prevent him from working, and disqualify him from receiving benefits. For instance, an employee who leaves employment because of ill-health: if his illness is severe enough to justify a voluntary leaving of employment, his illness will also, unless he speedily recovers or is readily adaptable to work of another type, justify a finding that he is not able to work." In *Teicher Unemployment Compensation Case,* 154 Pa. Sup. 250, 35 A. 2d 739, 741, a soldier's wife was held not to have left voluntarily "without good cause" but was held to be not available for work. In other jurisdictions where the South Dakota construction of "without good cause" is not followed, the Pennsylvania distinction between "leaving without good cause" and being able to work and available for work is followed. *Craig v. Bureau of Unemployment Compensation,* 83 Ohio App. 247, 83 N. E. 2d 628.

Unemployment benefits are not health insurance. *Henderson v. Department of Industrial Relations,* 252 Ala. 239, 40 So. 2d 629; *Labor & Industry Department v. Unemployment Compensation Board,* 133 Pa. Sup. 518, 3 A. 2d 211. This view of the Maryland act seems supported by the declaration of policy in section 2, the proviso in section 4 (c) that "no claimant shall be con-

sidered ineligible in any week of unemployment for failure to comply with the provisions of this subsection if such failure is due to an illness or disability which occurs after he has registered for work and no work which would have been considered suitable at the time of his initial registration has been offered after the beginning of such illness or disability" and the provision as to pregnancy in section 5(f). As to all other questions of construction above mentioned, we intimate no opinion or choice of conflicting opinions.

The lower court in its opinion said, "At the outset it should be made clear that it is not within the province of the court in this class of appeals to reverse the Board in any decision it makes as to matters of fact; because under the law 'the findings of the Board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law'. Article 95A, section 6 (h). Therefore, as to whether these two claimants were in fact able to work (*Bartlett* case) or in fact available for work (*Arthur* case) the decision of the Board is binding on this court. And the Board decided in favor of both. Whether the decision of the Board in the Arthur case can be reconciled with other decisions denying benefits in certain cases to men attending G. I. Schools cannot be passed upon by this court. This leaves only a legal question to be decided [whether Employer's account is chargeable, under section 7(c) (7), with wages paid to claimant] ; and on this point counsel on both sides have filed excellent and comprehensive written arguments." This is too narrow a statement of the scope of judicial review under section 6. The findings of the Board as to the facts are conclusive only "if supported by evidence". Questions of law—including questions of legal sufficiency of evidence—arising on the undisputed facts are reviewable. *Tucker v. American Smelting & Refining Company,* 189 Md. 250, 55 A. 2d 692.

The Board contends that its conclusions as to claimant's right to benefits are not reviewable in this court be-

cause the question was not raised in the lower court. Employer's appeal to the lower court was expressed in general terms broad enough to include the question of the right to benefits as well as the question of charging Employer's experience rating account. In fact, however, Employer in the lower court did not raise, but expressly disclaimed any intention to raise, the former question. In Employer's Memorandum in the lower court it was said, "While the Employer feels that the facts in this case measure up to a conclusion that Mrs. Bartlett left her employment voluntarily without good cause, and that the contrary finding of the Board to the effect that her unemployment was due to a lack of work is not supported by any fact in the record, *nevertheless the Employer as a matter of policy does not in this case or in any other cases,* except those of theft, *ever question the incorrectness of the Board's awards of unemployment compensation.* The duty rests on the Board to make a correct finding of law and fact in that respect. It is a burden that it assumes and *is not one for the Employer.* This statement is made by the Employer to clear up a misstatement of facts contained in the Attorney General's brief in the second paragraph on page 6, wherein he infers that this Employer has agreed in this case that benefits should be paid to the Claimant. This is an incorrect statement of fact. The Employer has never made any such agreement; but it does contend that, regardless of the fact that this court may decide that Mrs. Bartlett is entitled to unemployment compensation, nevertheless it is entitled to object to that part of the Commission's award which directs that any benefits that may be paid to Mrs. Bartlett shall be charged against the experience rating account of the Celanese Corporation; for if this is done, it will be directly in the teeth of the prohibition contained in section 7 of the Act which states: [quoting]." [Italics supplied.] We think Employer's denial that it has "agreed" that benefits should be paid to claimant, cannot change or qualify the statement that Employer does not "in this or any other cases

\* \* \* ever question the incorrectness of the Board's awards of unemployment compensation". The Board's contention is therefore well founded and the question, which Employer elected not to raise in the lower court, cannot be raised in this court. Apparently the lower court's statement as to the effect of section 6 was an inadvertence due to ascribing to section 6 Employer's determination, as a matter of policy, not to raise the question of right to benefits, which it could have raised, had it chosen to do so, under its appeal under section 6. Rule 9 of this court, that the court shall not "decide any point or question which does not plainly appear by the record to have been tried and decided by the court below" dates back to the Act of 1825 and is frequently a part of appellate procedure.

Assuming then (as we must) that claimant was entitled to benefits and did not leave work voluntarily "without good cause" (whatever that may mean), we think it necessarily follows that she did not "leave the service of the employer voluntarily without good cause attributable to her employer". Unquestionably she left to take advantage of the option in the collective bargaining agreement between Employer and its employees. Assuming (without deciding) that this agreement constituted "good cause" from her point of view or "attributable to her", the agreement obviously was no less "attributable to the employer". This is the plain meaning of section 7(c) (7) of the act, and if it were necessary or permissible to look beyond section 7(c) (7), it is the clear purpose of the act. Article 16 (c) may, and doubtless does, help labor relations between Employer and its employees, but the fact that Employer by such a technological displacement allowance may enable employees who are older and in impaired health, who will find it more difficult to obtain other employment, to terminate their employment, furnishes no just reason for not charging their benefits to Employer's experience rating account and charging them to other em-

ployers who are not directly or indirectly responsible for them.

We do not hold that the terms of section 7(c) (7) may not in any case produce a result somewhat at variance with the main purpose of the act, or that in such event we may ignore the provisions of section 7(c) (7) by reading them out of the act or reading others in. *Celanese Corporation v. Davis*, 186 Md. 463, 47 A. 2d 379. We merely hold that in the instant case both the plain meaning of section 7(c) (7) and the dominant purpose of the act concur in requiring that the agreement be regarded as cause "attributable to the employer".

If it be said that the result in the instant case is reached on somewhat "technical" grounds, it is also in accord with substantial reality. It may be a wise labor policy not to contest awards of benefits. The law does not forbid such a policy. But the courts cannot permit such a policy to be carried out by permitting employees to collect benefits to which they may not be legally entitled and then, in the absence of clear statutory authority, charging such benefits to other employers instead of the employer which permits them to be paid.

### The Arthur Case.

Miss Arthur, the other claimant, had been employed in the Twisting Examination subdivision of the Textile Department since November 12, 1934. After notice that there were twelve jobs in this department which had been permanently abolished, she elected, in accordance with the option in Article 16, section (c), to terminate her employment, and on November 9, 1950 made written application for technological displacement allowance. On November 16, 1950 she relinquished her employment and on November 21, 1950 collected her allowance, amounting to $768.00, and signed a receipt.

On November 20, 1950 she filed claim for unemployment compensation, stating, "I am now available for work at night only as I am starting to Bible College". The claim examiner held her disqualified under section 5(b). On her appeal, the Referee denied her benefits

because he found that she was unavailable for work. On her appeal before the Board, the Board found "that the claimant's separation from work was because of a lack of work. Under section 7(c) (7) of the Maryland Unemployment Compensation Law, any benefits paid to the claimant must be charged against the account of the employer", and held, "The claimant became available for work as of March 14, 1951, and, if otherwise eligible, she is entitled to benefits from that date. The decision of the Referee is modified to conform with this decision." A stipulation of counsel shows later action from which an appeal might have been taken but apparently was not taken. At all events, no such appeal is before us.

The decision that, "if otherwise eligible, she is entitled to benefits from that date" is not a final decision. "Statutory provisions for appeal from, or review of, orders of administrative tribunals have generally been construed as applicable, not to interlocutory orders, but only to final orders." *Big Vein Coal Co. v. Leasure,* 192 Md. 435, 437, 64 A. 2d 563, 564, and cases cited; *Bonner v. Celanese Corporation,* 193 Md. 132, 135-136; *Bogley v. Barber,* 194 Md. 632, 72 A. 2d 17, 20; *Federal Power Commission v. Metropolitan Edison Co.,* 304 U. S. 375, 58 S. Ct. 963, 82 L. Ed. 1408.

The appeal in the Arthur case was therefore premature, and should have been dismissed.

> *Order in the Bartlett case affirmed with costs.*

> *Order in the Arthur case reversed, costs to be paid by the Employer.*