## STEUART INVESTMENT COMPANY *v.* BOARD OF COMMISSIONERS, ST. MARY'S COUNTY, MARYLAND ET AL.

[No. 1079, September Term, 1976.]

*Decided January 10, 1978.*

The cause was argued before MOYLAN, DAVIDSON and MOORE, JJ.

*Oliver R. Guyther* and *Norman M. Glasgow,* with whom were *Robert V. Smith, Alfred H. Carter, John F. McCabe, Jr.,* and *Wilkes & Artis* on the brief, for appellant.

*Amicus curiae* brief filed by *James F. Vance* in behalf of Potomac River Association, Inc.

*Joseph Ernest Bell, II, County Attorney,* for appellees.

DAVIDSON, J., delivered the opinion of the Court.

The appellant, Steuart Investment Co. (Steuart), is the owner of 397 acres of industrially zoned land at Piney Point, St. Mary's County, on which since 1950 it has operated an oil storage facility, a permitted use,[1] now containing 26 storage tanks. In August, 1975, as a prerequisite to the issuance of building permits for the construction of additional tanks identical to four existing tanks, Steuart submitted a site plan for approval.[2] Steuart also submitted a report from a civil

---

1. St. Mary's County Zoning Ordinance (Zoning Ordinance), art. 9, § 9.4 B.3. (28 May 1974, as amended 10 March 1977).
2. Zoning Ordinance, art. 9 and art. 14. Article 9, § 9.2 E provides:

"Site Plan. For every industrial structure and use erected, reconstructed, altered, or enlarged after the effective date of this Ordinance, a site plan shall be filed with the Zoning Administrator. No building permit shall be issued until said site plan is approved by the Planning Commission and the Board of County Commissioners. The Planning Commission may recommend and the County Commissioners may require additional standards and requirements to those stated in this Article as are necessary for the maximum protection of the environment and health and safety of the citizens of the County."

Section 9.3 provides a set of Performance Standards, including noise, vibration and glare limitations, and smoke and particulate matter, toxic matter and odorous matter limitations. In addition § 9.3 J provides:

"Conformance with State and Federal Regulations. The preceding regulations shall apply to the Industrial Districts of the County. The performance standards applicable to industrial uses will include all adopted air pollution, water pollution, noise, health or other relevant federal and state laws and regulations (see Article 48, Annotated Code of Maryland, 1957 edition and supplemented by Chapter 10.03.04, Regulations Governing the Control of Air Pollution in Area

engineer to show compliance with the Zoning Ordinance. After holding hearings and requiring Steuart to file grading and soil sedimentation control plans and to upgrade the fire protection system, the Technical Evaluation Committee

> V).* In addition, the County Commissioners may affix other conditions upon applicants for industrial zoning, including but not limited to those conditions outlined in this Ordinance, so as to protect the public health, safety, and welfare.
>
> "No use shall be established in an Industrial District after the effective date of this Ordinance which shall cause a violation of federal and state laws and regulations relating to air and water pollution, noise, health or other relevant laws and regulations. No use shall be established in an Industrial District after the effective date of this Ordinance which shall cause a violation of the conditions and standards affixed by the County Commissioners either by this Ordinance or by vote of the County Commissioners pursuant to the objective of protecting the public health, safety, and welfare.
>
> "The applicant for a grading permit, sedimentation permit, building permit for uses in an industrial zone, or applicants for industrial zone, exceptions to the zone, or variances to the zone shall be required to submit proof that the uses proposed will not cause violations of federal and state and county laws and regulations. For industrial uses which will produce emissions of pollutants to the waters and air of the county, this proof shall include measurements of the ambient water and air quality as well as documentation in the form of figures that the additional planned and proposed industrial use will not cause the violation of either ambient or source standards outlined by the laws and regulations of the federal, state and county governments."

Article 14, § 14.6 provides in pertinent part:

> "A. Zoning Administrator. The Zoning Administrator shall be responsible for checking the site plan for general completeness and compliance with such administrative requirements as may be established prior to routing copies thereof to reviewing departments, agencies, and officials. He shall see that all reviews are completed on time and that site plans are submitted to the Planning Commission within 45 days, except under abnormal circumstances, from the receipt thereof in his office. All site plans shall be submitted for consideration by the Planning Commission (and in the case of industrial site plans also to the Board of County Commissioners as consistent with Article 9.2E) after having been reviewed for completeness by the Zoning Administrator and appropriate County Departments, . . ."

Section 14.16 provides:

> "The Planning Commission shall be the approving authority for all site plans, except Industrial site plans which shall also require the approval of the Board of County Commissioners. Such approval shall be based on recommendation of the Zoning Administrator, County Engineer, and other appropriate agencies, and provisions contained in this Ordinance. The Planning Commission may delegate authority for specific site plan approval to the Zoning Administrator."

(TEC)[3] approved the site plan. After hearings, the Planning Commission recommended approval of the site plan with a "stipulation that all Federal, State and County regulations and Ordinance requirements be met prior to the expansion of operation of the additional tanks; and that the appropriate agencies be requested to provide results of any evaluation and approvals as may be forthcoming."[4] Subsequently, the Planning Commission indicated that in its opinion "all regulatory requirements are currently satisfied as prerequisite to site plan approval."[5]

Notwithstanding that neither article 9 nor article 14 of the Zoning Ordinance requires a showing that the proposed facility does not lie within a fifty-year flood plain, on 8 January 1976, Steuart, in answer to a request from the Board of County Commissioners (Board),[6] provided information showing that its facility was not so located. On 16 January 1976, in answer to a request from the Board regarding ambient water and air quality at the Piney Point facility, Steuart explained that the earthen dike surrounding each tank prevented water pollution and that measurements of the air quality would be meaningless because there were no State standards for hydrocarbon emissions.

On 4 February 1976, the Board determined that "additional, objective data is needed to ultimately decide whether to

---

3. St. Mary's County Board of County Commissioners Res. 74-39 (16 October 1974).
4. The following agencies were contacted: Metropolitan Commission, County Engineer, Health Department, Soil Conservation, State Fire Marshal, Environmental Protection Agency (Air and Waste Management, Water and Hazardous Materials), Department of the Interior (Bureau of Outdoor Recreation, Fish and Wildlife Service, U.S. Geological Survey), Department of Commerce (National Marine Fisheries Service, Maritime Administration), Department of Health and Mental Hygiene (Bureau of Air Quality and Noise Control, Bureau of Community Health Protection), Department of Natural Resources (Energy and Coastal Zone Administration and Water Resources Administration), Maryland Geological Survey, Potomac River Fisheries Commission, Interstate Commission on Potomac River Basin, and Chesapeake Biological Laboratory.
5. The agencies generally indicated that they approved, that they had no comments, or that they had no applicable regulations. Only the Potomac River Fisheries Commission opposed.
6. Zoning Ordinance, art. 9, § 9.2 E, art. 14, §§ 14.6, 14.16.

approve or disapprove the site plan as proposed." In a letter dated 5 February 1976, it asserted that there was:

> "a lack of data which might be properly termed probative evidence to substantiate an allegation that all requirements of the Zoning Ordinance have been met. Specific reference is made to Article 9.3 'Performance Standards', A-J. While it is true that some such data has been supplied by the applicant and additional data has been assembled from federal and state agencies by Mr. Richard Platt, at the direction of the Planning Commission, it does not comply fully with the scope and intent of Article 9.3J."

Notwithstanding the fact that the uncontradicted evidence showed that "the proposed tank expansion would not increase through-put," [7] the Board found that "the fact that the proposed expansion represents a substantial increase in capacity would on the surface, at least, make such testimony inconsistent." It determined that the "impact upon the loading and unloading facilities and operating procedures" resulting from a "potential for increased through-put of petroleum products" had "not been addressed." The Board concluded that:

> "an environmental impact analysis is needed to objectively decide in this matter. Such analysis should:
>
> "(1) Be paid for by the applicant. This is a reasonable expectation in that under the terms of the Zoning Ordinance, it is the burden of the applicant to show that any proposed establishment or expansion of an industrial use is in conformance with the performance standards of the Ordinance.

---

7. "Throughput" is defined as "the amount of material put through the operations in processing in a given time." *Webster's New International Dictionary* (2d ed. 1957).

"(2) Be performed by a firm of the Board of County Commissioners' choosing and directed by the Board of County Commissioners. The applicant and the St. Mary's County Environmental Committee shall be allowed to review the credentials of any proposed firm and comment on same prior to final selection.

"(3) Be organized in such a fashion that will identify each requirement of the Zoning Ordinance and address same by providing probative evidence relative to each requirement.

"(4) Devote particular and concerted attention to the loading and unloading facilities and operating procedures — both from the standpoint of what exists and what might be required if the proposed expansion increases through-put. This phase of the analysis should include a determination of what the 'technological state of the art' is with respect to loading and off-loading petroleum and containment of spills; and should further compare Steuart's operating procedures and facilities to such.

"The Board of County Commissioners should like to assure the applicant that it shall not act in an arbitrary and capricious manner in this case, but rather shall base its ultimate approval or disapproval on the objective data developed through the environmental impact analysis.

"The Board shall await your response to this letter and stands ready to promptly work out the details as to who shall perform the environmental impact

analysis and the procedures by which same shall be accomplished."

In a letter dated 4 March 1976, the Board submitted "draft-preliminary" specifications for the environmental impact analysis (EIA) to Steuart for review and invited Steuart "to discuss the matter further." In a letter dated 26 April 1976, Steuart asked that the building permits be issued. The Planning Commission, pointing out that the requirements of the Zoning Ordinance and "the additional requirements and standards deemed necessary by the St. Mary's County Commissioners ... have not yet been fulfilled," said "your request is denied." Steuart's request for a reconsideration of the denial of its application was denied "[u]ntil such time as the County Commissioners authorize otherwise."

In a letter to the Board dated 30 April 1976, Steuart, insisting that it had complied with all requirements of article 9, demanded that the building permits be issued. In a letter dated 6 May 1976, the Board wrote:

> "The Board wishes to reiterate that its position is the same today as stated in [the letters of 5 February and 4 March 1976]. Your demand that the site plan be approved and building permit issued within ten (10) days is therefore denied. The Board also wishes to reiterate its willingness to discuss the preliminary specifications for the environmental impact analysis so that the analysis may move forward."

On 25 May 1976, in the Circuit Court for St. Mary's County, Steuart filed a bill of complaint seeking, among other things, a writ of mandamus to compel the County to approve the site plan and issue the building permits. After oral argument, the trial court found, among other things, that: 1) the Zoning Ordinance authorizes the Board to approve industrial site plans; 2) the Zoning Ordinance authorizes the Board, even without a recommendation from the Planning Commission, to impose additional standards and requirements before approving an industrial site plan; and 3) the Zoning Ordinance contains sufficient guidelines to govern the imposition of

those additional standards or requirements. We agree for the following reasons:

1) On 10 March 1977, the Zoning Ordinance was amended to include a specific authorization for the Board to approve site plans.[8] Steuart concedes that the question of whether the Board has authority to approve industrial site plans is moot.

2) In interpreting a statute, the court must accord words their ordinary and natural signification. If the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the legislative body.[9] Here the 10 March 1977 amendments establish a legislative intent to place ultimate responsibility for industrial site plan approval in the Board. This implies that the legislature intended the Board to have the right to take such reasonable action as it deemed necessary in order to fulfill its responsibility. Accordingly, the statutory provision which authorizes the Board to impose additional standards and requirements [10] must be read as permitting the Board to exercise that function in a manner it deems appropriate independently of the recommendations of any other agency. Thus a Planning Commission recommendation is not required before the Board may impose additional standards or requirements.

3) When a legislative body delegates authority to administrative officials, it must establish adequate guides and standards, but such guides and standards need not be established when the legislative body itself is exercising the police power.[11] Here the Zoning Ordinance contains detailed standards which require that consideration be given to questions such as noise, vibration, smoke and particulate matter, toxic matter, odorous matter and glare. Additional

---

8. Zoning Ordinance, art. 9, § 9.2 E, art. 14, §§ 14.6, 14.16.
9. Mazor v. State, Dep't of Correction, 279 Md. 355, 360-61, 369 A. 2d 82, 87 (1977); Subsequent Injury Fund v. State Roads Comm'n, 35 Md. App. 353, 355, 370 A. 2d 597, 598 (1977).
10. Zoning Ordinance, art. 9, § 9.2 E.
11. Zellinger v. CRC Dev. Corp., 281 Md. 614, 622-23, 380 A.2d 1064, 1069 (1977); Gino's of Maryland, Inc. v. Mayor of Baltimore, 250 Md. 621, 640-41, 244 A. 2d 218,229 (1968); LaRoque v. Board of County Comm'rs, 233 Md. 329, 335-36, 196 A. 2d 902, 904-06 (1964).

standards and requirements which the Board may impose are limited to those "necessary for the maximum protection of the environment and health and safety of the citizens of the County."[12] These standards are adequate.[13] Accordingly, the Zoning Ordinance is valid whether the action of the Board is legislative or administrative.

The trial court additionally found that the regulations that permit the Board to impose additional standards and requirements comply with the requirement that the regulations shall be uniform throughout each district, and that the Zoning Ordinance as applied did not deprive Steuart of equal protection. We agree.[14]

Finally, the trial court rejected Steuart's contention that the Board had imposed a requirement that an EIA be provided. It concluded that because the content of the EIA had not been agreed upon, no requirement had yet been imposed. Consequently, it did not reach the question of whether the alleged additional requirement was arbitrary and capricious. More specifically, it stated that the letters dated 4 March 1976 and 6 May 1976 invited Steuart "to discuss the contents" of the EIA specifications and that because of Steuart's

> "failure to accept [the Board's] offer to discuss the preliminary specifications in a possible attempt to reduce or modify or eliminate them, *[Steuart] has clearly not exhausted its administrative remedies as to any claim of arbitrariness regarding content of such proposals* and will not be allowed to argue that point here. Because of [the Board's] invitation to discuss the contents, the draft-preliminary copy was not an imposed requirement." (Emphasis added.)

---

12. Zoning Ordinance, art. 9, §§ 9.2 E, 9.3.
13. Governor v. Exxon Corp., 279 Md. 410, 440-41, 370 A. 2d 1102, 1119 (1977); Montgomery County v. Walsh, 274 Md. 502, 523-24, 336 A. 2d 97, 110-11 (1975), *appeal dismissed,* 424 U. S. 901 (1976); Gordon v. Comm'rs of Montgomery County, 164 Md. 210, 213-14, 164 A. 676, 678 (1933); Tighe v. Osborne, 150 Md. 452, 457-58, 133 A. 465, 467 (1926).
14. Zellinger v. CRC Dev. Corp., 281 Md. 614, 620-23, 380 A. 2d 1064, 1068-69 (1977). *See* Montgomery County v. Woodward & Lothrop, Inc., 280 Md. 686, 719-20, 376 A. 2d 483, 501-02 (1977).

We do not agree.

Ordinarily, a court does not have jurisdiction in a case in which the protestant has not exhausted his administrative remedies.[15] To exhaust administrative remedies, a person must pursue the prescribed administrative procedure to its conclusion and await its final outcome.[16] Generally, resort can be had to a court only when there is a final order.[17] Here the question presented is whether the Board had imposed a requirement that an EIA be provided so that its refusal to act on Steuart's site plan in the absence of such an analysis was a final order.[18]

A final order of a court has been characterized as a judicial determination which settles some disputed right or rights of the parties or denies a person further means of vindicating his rights and interests in the subject matter.[19] While Maryland courts have considered whether a particular administrative determination is a "final order," the characteristics of such an administrative order have not been extensively articulated.[20] With respect to the finality of

---

15. State Dep't of Assessments & Taxation v. Clark, 281 Md. 385, 403, 380 7A. 2d 28, 37-38(1977); Comm'n on Medical Discipline v. Bendler, 280 Md. 326, 330, 373 A. 2d 1232, 1234 (1977); Verkouteren v. Supervisor of Assessments, 38 Md. App. 216, 219, 380 A. 2d 642, 643 (1977), Waller v. Montgomery County, 36 Md. App. 326, 330, 373 A. 2d 971, 973 (1977).

16. Shpak v, Mytych, 231 Md. 414, 418, 190 A. 2d 777, 779 (1963); 73 C.J.S. *Public Administrative Bodies and Procedure* § 41 b (1951).

17. Kay Constr. Co. v. County Council, 227 Md. 479, 489-90, 177 A. 2d 694, 699-700 (1962); Celanese Corp. v. Bartlett, 200 Md. 397, 409, 90 A. 2d 208, 214 (1952); 73 C.J.S. *Public Administrative Bodies and Procedure* § 189 (1951).

18. Steuart's contention that the issue of exhaustion of administrative remedies is not properly before this Court is without merit. Because a court has no jurisdiction in a case in which the protestant has not exhausted his administrative remedies, that issue involves a jurisdictional question. Accordingly, it may be raised by this Court on its own motion. Comm'n on Medical Discipline v. Bendler, 280 Md. 326, 327 & n. 1, 373 A. 2d 1232, 1232 & n. 1 (1977); Md.-Nat'l C.P. & P. Comm'n v. Washington Nat'l Arena, 37 Md. App. 346, 350, 377 A. 2d 545, 547, *cert. granted,* (C.A., 22 November 1977); Waller v. Montgomery County, 36 Md. App. 326, 334, 373 A. 2d 971, 975 (1977); Maryland Rule 1085.

19. United States Fire Ins. Co. v. Schwartz, 280 Md. 518, 521, 374 A. 2d 896, 898-99 (1977).

20. *See, e.g.,* Kay Constr. Co. v. County Council, 227 Md. 479, 490, 177 A. 2d 694, 700-01 (1962) (resolution of County Council granting reconsideration is not a final order); Celanese Corp. v. Bartlett, 200 Md. 397, 409, 90 A. 2d 208, 214 (1952) (decision that "if otherwise eligible, she is entitled to benefits" is not a final decision); Bogley v. Barber, 194 Md. 632, 640-41, 72 A. 2d 17, 20-21 (1950) (proper remedy is bill in equity to enjoin "enforcement of

administrative determinations, the United States Supreme Court has stated that: [21]

> "[A]dministrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process."

More recently that Court said: [22]

> "[T]he relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action."

We shall apply these criteria.

Here the record shows that the Board, in its letter of 5 February 1976, after its statement that "an environmental impact analysis is needed to objectively decide in this matter" of approval of Steuart's site plan, indicated that it was willing to "work out the details as to who shall perform the environmental impact analysis and the procedures by which same shall be accomplished." The Board's letter of 4 March 1976 repeated its willingness "to discuss the matter further." After Steuart demanded that the site plan be approved without an EIA, the Board, in its letter of 6 May 1976, denied

---

administrative action taken, not action feared but yet to be taken"; declaration that zoning reclassification would be reconsidered is not a final order); Big Vein Coal Co. v. Leasure, 192 Md. 435, 437, 64 A. 2d 563, 563-64 (1949) (order allowing claimant to amend his claim is interlocutory and not final); Great American Ins. Co. v. Havenner, 33 Md. App. 326, 332, 364 A. 2d 95, 99 (1976) (order or award by Workmen's Compensation Commission in matter then before it, determining issues of law and fact, which grants or denies some benefit under Workmen's Compensation law is final order); Flying "A" Service Station v. Jordan, 17 Md. App. 477, 480-81, 302 A. 2d 650, 653 (1973) (order entitled to review must be "an operative order which has the effect of granting or denying some benefit under the Workmen's Compensation law.").

21. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U. S. 103, 112-13, 68 S. Ct. 431, 437 (1948).

22. Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic, 400 U. S. 62, 71, 91 S. Ct. 203, 209 (1970).

the demand and reiterated "its willingness to discuss the preliminary specifications for the environmental impact analysis so that the analysis may move forward." This history demonstrates that although the contents of the EIA had not been agreed upon, the Board had determined that it would not act upon Steuart's site plan without an EIA of some as yet undetermined content. Thus the Board's action, as expressed in its letters, was to require an EIA as a prerequisite to site plan approval despite Steuart's protest. The Board's action imposed an obligation on Steuart to participate in the provision of the EIA and settled the disputed issue of whether an EIA was prerequisite to approval. The legal consequence of the Board's action was that, unless and until the Board obtained an EIA, Steuart's permit was, in effect, denied. Under all these circumstances, the Board's letter of 6 May 1976 was a final order and Steuart had thus exhausted its administrative remedies with respect to the requirement of an EIA even though the contents of the EIA had not yet been determined. Accordingly, Steuart is entitled to judicial review of the question of whether, under the present circumstances, the Board was arbitrary and capricious in requiring an EIA.[23]

With respect to judicial review of an administrative action alleged to be arbitrary or unreasonable, the Court of Appeals has said: [24]

> "The courts have been alert to exercise their residual power to restrain improper exercises of administrative powers whether judicial or legislative in nature. If the legislature has not expressly provided for judicial review, a court will ordinarily utilize its inherent powers to prevent illegal, unreasonable, arbitrary or capricious administrative action. In *Heaps v. Cobb,* 185 Md. 372, 379, this Court said: 'The legislature is without authority to divest the judicial branch of the government of its inherent

---

23. This question, although not decided by the trial court, will be decided here to avoid the expense and delay of another appeal to this Court. Maryland Rule 1085.

24. State Ins. Comm'n v. Nat'l Bureau of Cas. Underwriters, 248 Md. 292, 300-01, 309-10, 236 A. 2d 282, 286-87, 291-92 (1967).

power to review actions of administrative boards shown to be arbitrary, illegal or capricious, and to impair personal or property rights; * * *,' and then quoted the opinion in *Hecht v. Crook,* 184 Md. 271, 280:

> " 'Courts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts; but in exercising that power care must be taken not to interfere with the legislative prerogative, or with the exercise of sound administrative discretion * * *,' "

*"Administrative action may be arbitrary or unreasonable if it is not based on or supported by sufficient facts or proper factual inferences.* The Court in *Heaps* at page 378 quoted the language of the Supreme Court in the *Chicago Junction Case,* 264 U. S. 258, 265, 68 L. Ed. 667, 674, that: *'To refuse to consider evidence introduced, or to make an essential finding without supporting evidence, is arbitrary action,'* and added: 'Administrative boards in general may be said to act in a quasi judicial capacity insofar as they have the duty to hear and determine facts and, *based on them,* to make decisions.

. . .

"Whichever of the recognized tests the court uses —substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record — its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. . . . There are differences but they are slight *and under any of the standards the judicial*

*review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.* This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment. . . .

"We hold that a court in reviewing legislative actions or decisions of an administrative agency may apply the weight of the evidence test to the factual findings of the agency, without exercising nonjudicial functions, provided it does not itself make independent findings of fact or substitute its judgment for that of the agency. . . ." [25] (Footnote and citations omitted. Emphasis added.)

Thus the Court of Appeals has established that when an administrative agency, exercising either quasi-judicial or quasi-legislative power, hears and determines facts, and acts or makes decisions based upon those facts, a court, reviewing those acts or decisions, applies the weight of the evidence test. The court must determine whether a reasoning mind could have reached the factual conclusion reached by the agency. Administrative action is arbitrary and unreasonable if it is not based upon or supported by sufficient facts or proper factual inferences. Refusal to consider evidence introduced or making findings without supporting evidence is arbitrary action.[26]

Applying these principles, the Court of Appeals has recognized that in the administrative process, the requested benefit must be granted if the record shows compliance with

**25.** *See* Dep't of Natural Resources v. Linchester, 274 Md. 211, 225, 334 A. 2d 514, 523 (1975); Turner v. Hammond, 270 Md. 41, 55, 310 A.2d 543, 551 (1973); Rockville Fuel v. Bd. of Appeals, 257 Md. 183, 191, 262 A. 2d 499, 504 (1970); Montgomery County v. Merlands Club, Inc., 202 Md. 279, 292-93, 96 A. 2d 261, 267 (1953); Comm'r v. Cason, 34 Md. App. 487, 499-500, 368 A. 2d 1067, 1075 (1977); Anderson v. Sawyer, 23 Md. App. 612, 617, 329 A. 2d 716, 720 (1974), *cert. denied,* 274 Md. 725 (1975).

**26.** *Cf.* Aspen Hill Venture v. Montgomery County, 265 Md. 303, 317, 289 A. 2d 303, 310 (1972) (action of District Council refusing to rezone one tract and rezoning a nearby tract on the same facts held arbitrary and discriminatory); Polinger v. Briefs, 244 Md. 538, 541, 224 A. 2d 460, 461 (1965) (action of County Council in granting rezoning on basis of change where record was devoid of evidence of change held arbitrary and capricious).

all the applicable prerequisites, and there is no evidence to the contrary. Because there would be no foundation of fact upon which to base denial of the claim, denial would constitute arbitrary and capricious action.

In *Heaps v. Cobb*,[27] a widow's claim for pension benefits under the Baltimore City Employees' Retirement System was administratively denied. The trial court issued a writ of mandamus directing that benefits be paid and the Court of Appeals affirmed. Pointing out that testimony before the administrative agency had been uncontradicted, undisputed and unimpeached, that Court said:[28]

> "[T]he only conclusion to be reached is that the appellee has fully made out a case in compliance with every prerequisite of the ordinance, thus leaving no foundation of fact for the denial of her claim, and placing upon the appellant the mandatory duty of approving it."

In *State Health Department v. Walker*,[29] a property owner's application for sewage disposal system permits was administratively denied. The trial court issued a writ of mandamus directing that the requested permits be approved and the Court of Appeals affirmed. Pointing out that the testimony before the administrative agency had been uncontradicted, undisputed by legally admissible evidence and unimpeached, that Court said:[30]

> "The question presented to the court below was whether the Department acted arbitrarily in disapproving appellee's applications for sewage disposal permits. The Department defended its action on the basis that the soil and geological conditions of Walker's locations rendered them unsuitable for subsurface discharge of waste effluent from septic tank systems. As the moving party, appellee sought to establish by his own

27. 185 Md. 372, 45 A. 2d 73 (1945).
28. 185 Md. 372, 385, 45 A. 2d 73, 79 (1945).
29. 238 Md. 512, 209 A. 2d 555 (1965).
30. 238 Md. 512, 519-20, 523, 209 A. 2d 555, 559, 561 (1965).

expertise and that of the two Department employees, Dr. Waesche and Miss Schoolfield, that there was nothing about his sites that would, with the placement of sewage disposal systems thereon, create a hazard to health. It was incumbent upon the Department to prove just the opposite. For this purpose, Brown was called by the Department as its principal witness. Objections made by the appellee were sustained with respect to his giving an expert opinion concerning the soil and geological conditions of the two locations precluding a safe and proper operation of the desired installations.

. . .

". . . Appellee alleged in his petition that despite the fact that his sewage disposal systems complied in all respects with the applicable regulations, the Department refused without cause to approve his applications. The record before us discloses that the evidence presented in the lower court was ample to prove these allegations. Since the Department was unable to prove by legally admissible evidence that the systems did not meet the standards it imposed, its rejection of them must be either purely arbitrary or for reasons not related to its statutory function, and hence illegal. Decisions contrary to law or unsupported by substantial evidence are not within the exercise of sound administrative discretion, but are arbitrary and illegal acts." (Citation omitted.)

With respect to the instant case, these cases establish that if the record contains probative evidence showing compliance with all applicable requirements and no evidence to the contrary, an administrative action which results in a denial of a requested permit is arbitrary and capricious.

Applying these principles to the instant case produces a clear result. The record extract indicates that Steuart submitted evidence from a civil engineer which showed or supported a rational inference that the proposed use would

comply with all of the requirements of the Zoning Ordinance. After requiring Steuart to file grading and soil sedimentation control plans and to upgrade the fire protection system, the TEC approved the site plan. After hearings and after five county, seven state, and eight federal agencies had been contacted,[31] the Planning Commission found that "all regulatory requirements are currently satisfied as prerequisite to site plan approval," and approved the site plan. This probative evidence was sufficient to show compliance with the Zoning Ordinance. The record extract contains no evidence to show that the proposed expansion would not satisfy the requirements of the Zoning Ordinance. Under these circumstances, Steuart was entitled to approval of the site plan.[32]

The Board, however, found that there was "a lack of data which might be properly termed probative evidence to substantiate an allegation that all requirements of the Zoning Ordinance have been met," and that therefore an EIA must be provided to "identify each requirement of the Zoning Ordinance and address same by providing probative evidence relative to each requirement." Given the uncontradicted probative evidence sufficient to show compliance, these findings were incorrect.

The Board found that an EIA was necessary to "[d]evote particular and concerted attention to the loading and unloading facilities and operating procedures — both from the standpoint of what exists and what might be required if the proposed expansion increases through-put." These findings were unjustified because they were unsupported by direct evidence or rational inference.

The fact that storage capacity would be increased is not necessarily inconsistent with the fact that through-put would not be increased. For example, the provision of additional

---

31. *See* note 4 above.
32. State Health Dep't v. Walker, 238 Md. 512, 523, 209 A. 2d 555, 561 (1965). *See* Turner v. Hammond, 270 Md. 41, 55, 310 A. 2d 543, 551 (1973); Rockville Fuel v. Bd. of Appeals, 257 Md. 183, 193, 262 A. 2d 499, 505 (1970); Miller v. Kiwanis Club, 29 Md. App. 285, 288-90, 347 A. 2d 572, 574-75 (1975); Anderson v. Sawyer, 23 Md. App. 612, 617, 329 A. 2d 716, 720 (1974), *cert. denied,* 274 Md. 725 (1975).

storage might result in increased efficiency rather than increased through-put.[33] Under these circumstances and given the uncontradicted evidence that through-put would not be increased, the fact that storage capacity would be increased does not support a rational inference that through-put would be increased.

Again, the record extract contains no evidence that Steuart's existing operations failed to comply with all applicable regulations or that they had an adverse effect on the environment. More particularly, with respect to prevention and containment of oil spills, the record extract shows that the United States Environmental Protection Agency had approved the Spill Prevention Control and Countermeasure Plan developed by Steuart for its present facility and, in an inspection on 9 January 1975, had found that facility "to be in compliance with the existing plan." The Maryland Department of Natural Resources had indicated that monthly inspections by the Enforcement Division of the Water Resources Administration showed that the existing facility met "all the requirements of the water pollution control law and regulation 08.05.04.07 — Prevention of Oil Pollution." [34] Moreover, the record extract contains no evidence to show a change in Steuart's operating procedures and facilities other than the construction of the proposed storage tanks.

The Board, however, found that the EIA was required to determine "what the 'technological state of the art' is with respect to loading and off-loading petroleum and containment of spills; and should further compare Steuart's operating procedures and facilities to such." Under these circumstances, the Board's finding was unjustified. Because the Board's findings with respect to the necessity of an EIA were unsupported by facts or proper factual inferences, its action in imposing a requirement that an EIA be provided was arbitrary and unreasonable.

---

33. Indeed, in its brief, Steuart explained that the proposed "[a]dditional storage would reduce the number of unloadings and loadings required."

34. Md. Nat. Res. Code Ann. §§ 8-1401 to 1417 (1974 and Cum. Supp. 1977).

In addition, the Board's action is arbitrary and capricious because it refused to consider the evidence introduced and relied upon by Steuart. The Board's statement that it would "base its ultimate approval or disapproval on the objective data developed through the environmental impact analysis" established that the Board had determined to disregard all of the evidence before it, including that presented by Steuart, its own TEC, and its own Planning Commission, and to rely instead solely upon evidence to be presented by a firm paid by Steuart, but over which Steuart would have no control. In so doing, the Board substantially interfered with Steuart's right to carry its burden of proof with evidence of its own choosing. The action of the Board was patently unfair.

The Board's requirement that an EIA be performed as prerequisite to site plan approval was arbitrary and unreasonable. Accordingly, we shall reverse and remand for the entry of an appropriate order.

*Order and decree reversed.*
*Case remanded for entry of an order*
*consistent with this opinion.*
*Costs to be paid by appellees.*